[L. A. No. 16085. In Bank.—March 1, 1939.]

PEARL S. CANFIELD, Appellant, v. SECURITY–FIRST NATIONAL BANK OF LOS ANGELES (a Corporation), Respondents.

[L. A. No. 16083. In Bank.—March 1, 1939.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Appellant, v. SECURITY–FIRST NATIONAL BANK OF LOS ANGELES (a Corporation) et al., Respondents.

[L. A. No. 16086. In Bank.—March 1, 1939.]

PAULINE CATO, Appellant, v. SECURITY–FIRST NATIONAL BANK OF LOS ANGELES (a Corporation) et al., Respondents.

(1)

4

J. M. Danziger, Charles A. Buckley, Goodman, Bachrack & Brownstone, Herman A. Bachrack and R. M. J. Armstrong for Appellant Canfield.

Theodore Weisman and Arthur T. Stollmack for Appellant Cato.

Edmond Nelson, William C. Day, Theodore Weisman, Arthur T. Stollmack, Freston & Files and Louis Ferrari for Appellant Bank of America National Trust and Savings Association.

David R. Rubin, Newlin & Ashburn, R. W. Ashburn, McCutcheon, Olney, Mannon & Greene and J. M. Mannon, Jr., for Respondents.

WASTE, C. J.—These three actions were brought by plaintiffs as judgment creditors of respondent Charles O. Canfield against Canfield and the respondent Security-First National Bank of Los Angeles. The actions are in the nature of creditors' bills, brought under section 859 of the Civil Code. By them plaintiffs-appellants seek to reach the claimed beneficial interest of respondent Canfield in a discretionary spendthrift trust created by Charles A. Canfield, which trust is being administered by the respondent Security Bank as trustee. The three cases were consolidated for trial, were disposed of below by a consolidated judgment, and are presented on appeal on a single transcript.

The appellant, Pearl S. Canfield, is the former wife of respondent, Charles O. Canfield. In 1930 she secured from Canfield an interlocutory decree of divorce. The decree fixed the property rights of the parties, and, among other things, awarded this appellant $20,000, plus support and maintenance in the sum of $1,000 a month (later reduced to $800) during her lifetime or until her remarriage or until the death of Canfield.

The respondent Canfield having failed to pay either the $20,000 or any part of the monthly award, on September 29, 1931, appellant Pearl Canfield instituted one of the present actions in an attempt to reach the surplus of the income of the trust here involved, and of which respondent Canfield is beneficiary. Summons was served on the bank as trustee on that date. Respondents' demurrers to her complaint were sustained without leave to amend, and a judgment of dismissal entered. Upon Pearl Canfield's appeal the judgment was reversed, the District Court of Appeal holding that

in this state, by reason of certain statutory provisions hereafter referred to, a judgment creditor of the beneficiary of a discretionary spendthrift trust of the kind here involved can reach the surplus of the income of the trust in the hands of the trustee beyond the amount necessary for the education and support of the beneficiary. This court denied a hearing (*Canfield* v. *Security-First Nat. Bank*, 8 Cal. App. (2d) 277 [48 Pac. (2d) 133]).

█ Upon the filing of the *remittitur* on that appeal, respondents answered, and in February, 1936, the cause was tried on its merits, together with the other two cases. Of course, whatever was decided on the first appeal in the Pearl Canfield action became the law of the case as to that action.

The Cato case was commenced and summons served on the trustee bank on September 13, 1935. Cato is the assignee of a judgment against Charles O. Canfield in the sum of $10,463.46, which judgment was secured in February, 1932.

The Bank of America case was commenced and summons served on the bank on September 19, 1935. The Bank of America is the assignee of a judgment against Charles O. Canfield in the sum of $46,611.41, which judgment was secured on the same date as the Cato judgment.

On the present trial the court found that there was due Pearl Canfield from respondent Canfield the sum of $79,-958.66; that there was due to Cato and the Bank of America the amounts of their respective judgments, plus interest and attorneys' fees; that said claims should be paid from the surplus income of the trust, if any; that each of the appellants has a lien on the surplus income from the trust; that said liens, as against respondents, date from the date of entry of the judgment in this case; that as between the three appellants they are entitled to priority in accordance with the order in which the respective complaints were filed; that the sum of $30,000 per annum is necessary to support Charles O. Canfield in the station of life to which he has been and now is accustomed to live; that said sum is exempt from appellants' claims; that the amount of income awarded to Charles O. Canfield as beneficiary of the trust by the trustee under the provisions of the trust rests in the discretion of the trustee; that if the trustee allocates more than $30,000 in any one year to respondent Canfield the surplus

is subject to the claims of appellants as provided in the judgment.

The trust here involved was created by the will of Charles A. Canfield, father of respondent Charles O. Canfield. The will disposed of an estate of several millions of dollars. To all of his children other than Charles the testator left outright a legacy of $1,000,000, and these other children were also made residuary legatees. In reference to Charles the will bequeathed $900,000 to the Security Bank as trustee for the benefit of Charles and his two children by a prior marriage, one such child having since died without issue, the other being intervener Laura Elaine Canfield McMillen. The trust thus created for the benefit of Charles was a spendthrift trust, discretionary in character. In the will the testator gave as his reason for thus creating this type of trust that the past conduct and life of his son had been "one of waste, dissipation and extravagance; and that his present associations, conduct and mode of living indicate no existing purpose of reform on his part; and that the probability of his reforming in the future, in my judgment, amounts to no more than a father's hope". A decree of partial distribution in the father's estate was made on March 30, 1914. It embodies practically *verbatim* the provisions of the will as to the terms and conditions of the trust. It provides that the designated securities are distributed to the respondent Security Bank in trust to " 'collect, recover and receive the rents, issues, dividends, profits and incomes of said' estate, investing and reinvesting the principal thereof when necessary or advisable in the judgment of its president or general manager for the time being", and, after paying certain enumerated expenses and charges, "to use, apply and pay over the net income remaining, as follows:

(a) Out of said income to pay, in monthly installments, twelve hundred dollars ($1,200) per annum only to and into the proper hands of said Charles O. Canfield . . . and not by way of anticipation, nor to any assignee of my said son, nor to or upon any order which my said son shall give, whether such assignment or order be the voluntary contractual act of said Charles O. Canfield or be made pursuant to or by virtue of any legal process in attachment, execution, bankruptcy, or otherwise.

(b) Out of said net income, in addition to said annual income of twelve hundred dollars ($1,200), to pay and apply, as said trustee shall deem advisable in the judgment of its president or general manager for the time being, . . . whatever sums said trustee may deem proper for the support, maintenance and education of Orville and Laura Elaine Canfield, . . . children of said Charles O. Canfield, in a manner suitable to their station in life, during their respective lives . . . ''. Orville Canfield has since died without issue. Acting pursuant to this provision of the decree of distribution the trustee has provided for the education of Elaine and for several years past has paid and is paying about $250 a month to her for her support and maintenance, which sum apparently the trustee has determined is all that is now necessary to maintain her in a manner suitable to her ''station in life''.

Paragraph c of the decree of distribution provides as follows:

''If, in the judgment of said trustee, to be exercised by its president or general manager for the time being, said Charles O. Canfield, son of said Charles A. Canfield, deceased, shall hereafter prove himself worthy of being entrusted with the expenditure of a larger annual income or allowance than that above given him, said trustee may, in such event, at any time, and in such proportions and at such time as to payments as it shall deem advisable in the discretion of its said officers, increase the said allowance and pay over such increase to said Charles O. Canfield up to the full limit of the net income of the said trust estate and any unexpended income which may have accumulated in the hands of the trustee, notwithstanding the provision above made as to payments out of the income for the maintenance and education of said Orville and Laura Elaine Canfield, grandchildren of said Charles A. Canfield, deceased.''

Paragraph d of the decree provides as follows:

''The foregoing provisions as to the application of the income of said trust estate are intended to commit to said trustee absolute discretion as to, and full power of control over, the application of all of the net income of said trust estate beyond the said sum of twelve hundred dollars ($1200.00) per annum.

"Said Charles O. Canfield shall have no interest or estate in the principal of the trust estate whatsoever, and he shall have no interest or ownership in the income thereof other or further than, or different from, the interest given him in and by this item. No interest of whatsoever nature given said Charles O. Canfield shall be subject to, or subject to be taken for the payment of, any debts whatsoever contracted by him, either before or after the death of said Charles A. Canfield, deceased, and for any purpose whatsoever, and that said Charles O. Canfield shall have no power or capacity to make any disposition whatsoever of any of said income by his assignment or by his order, voluntary or involuntary, and whether made upon the order or direction of any court or courts, whether of bankruptcy or otherwise; nor shall said interest be subject to any process of attachment issued against said Charles O. Canfield, or to be taken in execution under any form of legal process directed against him or against the trustee, or the trust estate, the income thereof, or any part of said income. But the whole of the income of the trust estate mentioned in this item shall go to and be applied by said trustee solely for the benefit of said Charles O. Canfield and of his said two children, Orville and Laura Elaine, free, clear and discharged of and from any and all obligations of said Charles O. Canfield whatsoever." The balance of this paragraph deals with what shall happen to the trust upon the death of Charles, these provisions not now being pertinent.

Since the date of the decree the trustee, as already indicated, has paid a small portion of the income to Elaine and in its discretion, having determined that respondent Charles O. Canfield is "worthy of being intrusted with the expenditure of a larger annual income" than $1,200.00, has paid over to Charles all of the remaining net income, under paragraph c, *supra*. The amount of these payments has varied over the years. In the year 1914, the year the trust was created, there was paid to Charles O. Canfield $2,000; in 1915 he was paid $6,700; in 1916 he was paid $23,018.20; in 1917 he was paid $39,940.87. Thereafter, and down to the date of the filing of the Pearl Canfield complaint in September, 1931, he has been paid various sums each year varying from $47,963.67 in 1919, as a minimum, to $101,521.63 in 1924, as a maximum. Since the filing of the Pearl

Canfield complaint and the service of summons on the trustee, down to January 29, 1936, the trustee has continued to pay all of the net income of the trust, after making the payments above mentioned to Elaine, to Charles O. Canfield. These sums were as follows:

9–29–31 to 9–29–32.....................$37,256.43
9–29–32 " 9–29–33..................... 27,701.86
9–29–33 " 9–29–34..................... 45,743.64
9–29–34 " 9–29–35..................... 34,017.84
9–29–35 " 1–29–36..................... 5,585.00

It thus appears that after the service of summons on the Security Bank as trustee, it paid to the beneficiary over $150,000.

It is to be noted that under the provisions of the trust above quoted there is no provision for the accumulation of income. In fact, had such a provision been inserted in the trust, as the law existed in 1914, the provision would have been invalid. (Sections 722 et seq. of the Civil Code as they read until their amendment in 1929.)

The first question to be determined is whether the appellants as judgment creditors may reach any portion of the income allocated to Charles O. Canfield by the trustee in view of the spendthrift provisions of the trust and in view of the discretionary powers conferred upon the trustee.

At common law, and in some American states, spendthrift trusts are invalid. These jurisdictions hold that it is against public policy to permit a debtor to have the use and enjoyment of wealth while his creditors go unpaid. As opposed to this view the majority of the American states have recognized the validity of spendthrift trusts, at least within certain limitations, either by judicial decision or by special statute. The general theory of most of these cases seems to be that the donor of property has the right to choose the object of his bounty, and has the right to protect his gift from the creditors of the donee. Occasionally, an additional factor has been emphasized—namely, that the protection of impecunious beneficiaries is in accord with public policy, at least to the extent of keeping such beneficiaries from becoming public charges. (See for a general discussion of these principles, Spendthrift Trusts Reexamined, by George P. Costigan, Jr., 22 Cal. Law Rev., pp. 471, 482 et seq.; Griswold, Spendthrift Trusts, Chapters 1 and 2; *Seymour* v.

*McAvoy*, 121 Cal. 438 [53 Pac. 946, 41 L. R. A. 544]; *McColgan* v. *Magee, Inc.;* 172 Cal. 182 [155 Pac. 995, Ann. Cas. 1917D, 1050] ; *Cutter* v. *Hardy*, 48 Cal. 568; *Magner* v. *Crooks*, 139 Cal. 640 [73 Pac. 585].)

In California, prior to the adoption of the codes in 1872, spendthrift trusts were recognized as valid without limitation. (*Cutter* v. *Hardy, supra; Seymour* v. *McAvoy, supra.*) Upon the adoption of the codes this type of trust was expressly authorized by the provisions of section 867 of the Civil Code, which provides:

''The beneficiary of a trust for the receipt of the rents and profits of real property . . . may be restrained from disposing of his interest in such trust . . . ''. But while this section authorized the creation of spendthrift trusts, section 859 of the Civil Code, also passed in 1872, placed a limitation thereon. That section as it read until its amendment in 1935, provided that:

''Where a trust is created to receive the rents and profits of real property, and no valid direction for accumulation is given, *the surplus of such rents and profits, beyond the sum that may be necessary for the education and support* of the person for whose benefit the trust is created, is *liable to the claims of the creditors of such person,* in the same manner as personal property which cannot be reached by execution.''

It has been held that this section applies to spendthrift trusts created under the authority of section 867 of the Civil Code. (*McColgan* v. *Walter Magee, Inc., supra; Magner* v. *Crooks, supra; Canfield* v. *Security-First Nat. Bank, supra.*) For the same reasons the limitations of section 859 of the Civil Code necessarily apply to discretionary trusts.

Section 859 constitutes a statutory modification—a statutory limitation—on the power to create such trusts. As far as trusts within the purview of the section are concerned, the legislature has determined that the trustor is without power to create any kind of trust—spendthrift or discretionary — that can successfully place the income, except the amount necessary for the ''education and support'' of the beneficiary, beyond the reach of creditors of the beneficiary. California has thus placed a statutory limitation or restraint on the unlimited power of a donor to give his property to whom he may desire subject to whatever conditions the donor

may want. At the same time, in recognition of the fact that public policy also requires that impecunious beneficiaries should be protected from their creditors so as to prevent them from becoming public charges, the legislature has provided that the amount of income necessary for their "education and support" shall be free from the claims of creditors.

There can be no doubt that section 859 is applicable to this trust. On the prior Canfield appeal it was pointed out, first, that this trust contains no valid provision for the accumulation of the income. On the present Pearl Canfield appeal this holding has become the law of the case, while on the Cato and the Bank of America appeals, it stands as a sound precedent. It should also be mentioned that on the present trial the court below expressly found that the trust contains no provision for accumulation of income.

On the prior appeal the respondents contended that the trust was created to receive the income from personal property and not the rents and profits of real property, and that for that reason section 859 of the Civil Code was not applicable. This was one of the main points involved on that appeal. The appellate court held that the contention was incorrect for several reasons:

1. That properly interpreted, section 859 of the Civil Code not only applies when real property is included as part of the *corpus* at the time of creation of the trust, but also applies whenever it appears from the provisions of the trust that the donor intended or contemplated that during the life of the trust the *corpus* would or could include real property; that in this case, although the trust as originally created consisted only of personal property, by the wide powers of investment and reinvestment conferred on the trustee, without qualification as to the nature of the property, obviously it was contemplated that real property might become part of the *corpus* of the trust estate. It should be added that the record herein discloses that although the trustee has never directly invested the trust funds in real property, some portion of the *corpus* now consists of real property as the result of foreclosures, and other steps taken to protect the trust.

2. That even if the *corpus* of the trust were specifically limited to personal property, nevertheless section 859

of the Civil Code would be applicable for either of two reasons:

a. First, that section 859 of the Civil Code was copied from a New York statute; that at the time of its adoption in California the New York courts had many times held that its statute applied to trusts of personal property; that under the proper rules of construction, when a statute is adopted from a sister state that has been construed by the courts of that state, the judicial construction is likewise adopted; and that section 859 of the Civil Code must be so construed particularly in view of the annotations of the original California Code commissioners clearly indicating that the New York construction was intended to be adopted.

On these points the District Court of Appeal in *Canfield* v. *Security-First Nat. Bank, supra,* stated at page 284:

"Appellant further contends that even assuming the trust herein was created to receive the income from personal property alone, or from part personal and part real property, she may nevertheless maintain the action under the doctrine established and followed by the courts of the state of New York. This contention is based largely upon the fact that at the time of the adoption of our codes in 1872, our section 859 of the Civil Code was taken from a New York statute (1 N. Y. Rev. Stats. 729, sec. 57), enacted in 1829 (*Magner* v. *Crooks, supra*); and that prior to the time of so adopting said code section the New York courts had held that the provisions of their statute applied to trusts of real and personal property alike (*Hallett* v. *Thompson,* [1836] 5 Paige [N. Y.] 583; *Rider* v. *Mason,* 4 Sandf. Ch. [N. Y.] 351; *Sillick* v. *Mason,* [1847] 2 Barb. Ch. [N. Y.] 79); and such doctrine has since been followed consistently in that state. (Citing many later New York cases.) Up to the present time the question of whether the New York rule of construction should be followed in this state has not been expressly passed upon; but since the year 1854 the Supreme Court of this state has held by an unbroken line of decisions that when this state borrows and adopts a constitutional or statutory provision from another state, which has received judicial construction in that state, it does so in view of such judicial construction and acquiesces in the correctness thereof. (Citing cases.) It would seem, therefore, that by adopting the New York statute, this state, impliedly at least, adopted

also the rule of construction placed thereon by the New York courts; and this would seem to be especially true in this particular instance because the case of *Sillick* v. *Mason, supra,* was one of the cases cited by the code commissioners in furtherance of the adoption of said section 859. (*Baranov* v. *Scudder,* 177 Cal. 458, 465 [170 Pac. 1122].)''

b. The second reason advanced by the appellate court was that, independently of the above rules of construction, the reasoning of the New York cases is sound, and should on principle be adopted. On this phase of the case the District Court of Appeal stated at page 285:

''But aside from the foregoing rule of statutory construction, we are convinced, after analyzing the New York cases above cited, that the reasoning thereof is sound and that the doctrine established thereby is just and equitable, and inasmuch as its adoption here is not a matter for legislative enactment but one for judicial decision, it is our opinion that it should be followed in this state. In declaring such doctrine the New York court in *Hallett* v. *Thompson, supra,* said: 'The provisions of the revised statutes on this subject, . . . in the connection in which they are there found, are applicable to trusts to receive rents and profits of real estate, and to apply them to the use of the *cestui que trust* for life, or a shorter period. But courts of justice have always endeavored to preserve the analogy between estates or interests in land, or the income thereof, and similar interests in personal property. By analogy therefore to these rules as to the interest of a *cestui que trust* in the rents and profits of real estate, and the right of a judgment creditor to reach the surplus rents and profits of land beyond what is necessary for the support and maintenance of the debtor and his family, I feel myself bound to hold that a creditors' bill will reach a similar interest of the debtor in the surplus income of personal property, held by another for his use and benefit. . . . ' '' The appellate court then quotes from several later New York cases to the same effect, one such case being *Cutting* v. *Cutting,* 86 N. Y. 522, where the court stated: '' ' . . . There is certainly much force in the position that one body of law should not declare a different rule for two kinds of property, when there is nothing in the nature of either kind of property, or in the nature and effect of the rule that calls for it. Clearly in the nature of things there

is no reason why a gift or bequest of personal property, with a power of disposition, should not be measured by the same rule as a grant or devise of real estate with the same power. Nor is there cited or suggested any express provision of statute law, that stands in the way of application of the rule of the Revised Statutes to both kinds of property.' '' After this quotation the appellate court continued as follows: ''Moreover, it may be stated that the favorable view we have taken of the New York doctrine on this controversial question is in harmony with the conclusions reached by legal authors who have given much thought and study to the subject. As said by Professor Costigan in one of the notes to his treatise on spendthrift trusts (found in ''Legal Essays'', published by the University of California in tribute to Dean McMurray, p. 110) : 'It is true, of course, that logically California need not follow New York except in respect to trusts of real property . . . but naturally, like New York, it will treat alike spendthrift trusts of realty and spendthrift trusts of personal property.' And as further pointed out by him, the decision of the Supreme Court of this state in *Estate of Edwards,* 217 Cal. 25 [17 Pac. (2d) 116], 'seems to indicate a desire of the California courts to follow the New York rules as to spendthrift trusts'.

''The respondents argue that the New York doctrine is founded on another early statute of that state which provides that 'limitations of future or contingent interests in personal property are subject to the rules prescribed in relation to future estates in real property' (N. Y. Pers. Prop. Law, sec. 11; 5 Birdseye Cons. Laws of N. Y., 1929). But a reading of the decisions in the cases above cited shows that they were placed on other and distinct grounds.''

The appellate court likewise directly held that the section is applicable to discretionary trusts. In this connection the appellate court stated at page 287:

''Respondents contend also that the New York doctrine cannot be applied to a discretionary trust such as we have here, which provides that whatever payments shall be made to Canfield over and above the annual sum of $1,200.00 are subject to the absolute discretion of the trustee. Under the New York decisions, however, such factor does not deny to the creditor the right to maintain an action to collect a certain portion of whatever surplus the trustee might thereafter

decide to award the beneficiary over and above the amount necessary for his maintenance (*Hamilton* v. *Drogo,* 241 N. Y. 401 [150 N. E. 496]), which amount, in this state, is measured by the so-called 'station-in-life' rule. (*Magner* v. *Crooks, supra.*)"

We are in accord with the views expressed by the appellate court on the prior appeal. Respondents spend many pages of their voluminous briefs in an attempt to reargue these points. Clearly, in spite of respondents' contentions to the contrary, in the Pearl Canfield appeal, these holdings have become the law of that case. Even were this not so, we were convinced in denying the hearing in that case that the opinion enunciated the correct principles of law. Upon further deliberation, and upon full consideration of the many ingenious arguments of respondents, we are still convinced of the soundness of that opinion as a precedent, and therefore independently of the doctrine of the law of the case, believe that the prior opinion constitutes a sound precedent and should be followed.

For the foregoing reasons it must be taken as established that:

(1) Whatever income may be allocated or paid to Charles O. Canfield by the respondent trustee, the amount necessary for the reasonable support of Canfield (it being conceded that no sum is now necessary for his education) is completely exempt from the claims of appellants; and

(2) If a sum in excess of this is allocated to the beneficiary, surplus income is subject to the claims of creditors while in the hands of the trustee.

This in no way unlawfully interferes with the discretion vested in the trustee. As already pointed out, by section 859 of the Civil Code the legislature has seen fit to place a legislative restraint on the power of a trustor in creating a trust. No matter what the desires of the trustor may be, he is prohibited from creating a trust of the type here involved that will successfully place the surplus income beyond the reach of the beneficiary's creditors. If, as claimed by respondents, the trustee could, in its discretion, refuse to allocate any portion of the income beyond $1200 annually to Charles O. Canfield, or beyond the amount necessary for his support, then it is true that the creditors of Charles O. Canfield would get nothing. But when the trustee has exercised its discretion by

allocating nearly the entire net income to the beneficiary, the surplus income, under principles already discussed, after such allocation, in the hands of the trustee, is subject to the claims of the creditors of the beneficiary.

Respondents contend that the law announced on the prior Pearl Canfield appeal cannot be held applicable to this appeal for the reason that the present appeal involves the interpretation of the terms of the decree of distribution in the estate of Charles A. Canfield, while the prior appeal involved only the interpretation of the will of Charles A. Canfield. It is the contention of respondents that although the prior appeal may have determined that the provisions of the will must yield to the provisions of section 859 of the Civil Code, it did not decide that the decree of distribution was subject to that section. The provisions of the decree of distribution pertinent to the creation of the trust have been set forth, *supra*. The decree embodies the provisions of the will *verbatim*. It is respondents' contention that the provisions of the decree conferring absolute discretion on the trustee, and declaring the spendthrift nature of the trust, are in direct conflict with section 859 of the Civil Code; that the decree having become final must control; that the rule is well settled that a decree of distribution when final, whether correct or erroneous, or whether its provisions are in accord with or in violation of the law, must control the validity of the trust. Stated another way, it is contended that the decree establishes the validity of the trust, and that although the trust as set up in the will was subject to the provisions of section 859 of the Civil Code, when exactly the same language was incorporated into the decree without reference to section 859 the trust became a valid trust unlimited by that section. To state the contention is to refute it. Respondents rely on such cases as *Crew* v. *Pratt,* 119 Cal. 139 [51 Pac. 38]; *Goldtree* v. *Allison,* 119 Cal. 344 [51 Pac. 561]; *Keating* v. *Smith,* 154 Cal. 186 [97 Pac. 300]; *Manning* v. *Bank of California, Nat. Assn.,* 216 Cal. 629 [15 Pac. (2d) 746], and others stating the same rule. These cases do establish the conclusiveness of the decree, and do establish that an invalid trust set up in a will may be rendered valid by a final decree of distribution. But these authorities are not applicable here for two reasons. In the first place, the decree of distribution was before the appellate court on the first Canfield appeal. It

was mentioned in the complaint there being considered, in the briefs, and the appellate court mentioned it in its opinion. The second, and most important, reason why those cases are not applicable is that we are not here involved with the validity of the trust set up in the decree—the trust is undoubtedly valid—but with one of the incidents of that trust, namely, can the surplus income of such trust be reached by the creditors of the beneficiary? (We are here concerned with the interpretation of the decree.) Inasmuch as the trust set forth in the will is set forth *verbatim* in the decree, a decision interpreting the trust in the will necessarily interprets the trust set forth in the decree. As was said in *Manning* v. *Bank of California, Nat. Assn., supra,* page 637, relied upon by respondents:

"Although the decree of distribution supersedes the will as the measure of the rights of the parties, the will is part of the record in a probate proceeding, and where it is ascertained upon comparison that the decree is a counterpart of the will, without additions or alterations, the decree cannot be given a different or broader interpretation than the will."

The prior decision of the appellate court, even if it merely interpreted the will, would therefore be authority for the interpretation of the decree. Obviously, the probate court in distributing the estate to the trustee did so subject to the law applicable to such trusts—one such law being section 859 of the Civil Code. In entering its decree of distribution it did not purport to pass on the rights of creditors of the beneficiary, the appellants here, who were not creditors at the time, had no right of appeal, and were not then at all interested in the estate.

On the present trial, the court below found that $30,-000 a year was necessary for the support of Charles O. Canfield in order to maintain him in the station in life to which he is and has been accustomed to live, and exempted this annual sum from the claims of appellants. All appellants challenge this finding.

This finding would appear to be inconsistent with one of the conclusions of law. In finding VIII the court stated:

"It is true that no sum is now necessary for the education of the said defendant, Charles O. Canfield. It is true that the sum of $30,000.00 per annum, payable in such sums during each calendar year as the said Security-First National

Bank of Los Angeles . . . shall see fit is necessary, but it is not true that any larger sum than $30,000.00 per annum is necessary for the support of the said Charles O. Canfield in and according to the station in life in which he is, and for a long time prior to the commencement of the Canfield case, and at all times since has been accustomed to live.'' The same finding declares that any income in excess of $30,000 per annum allocated to Canfield is subject to appellants' claims. In its conclusions (No. IV) the trial court held that whatever sums the respondent bank had paid to Charles O. Canfield since the commencement of the Pearl Canfield action down to November 15, 1935 (the date covered by the last account filed by the bank), ''were paid to said Charles O. Canfield to maintain himself in the situation in life to which he had been accustomed, and was accustomed, to live at the time said sums were paid''. After the date of filing the Canfield complaint in 1931 down to January 29, 1936, the trustee, except in 1933, paid to Charles O. Canfield each year various sums substantially in excess of the $30,000 a year, the sum found to be the amount necessary to maintain the beneficiary in the station of life to which he was accustomed. The actual amounts so paid have already been set forth in this decision. Obviously, conclusion IV is inconsistent with finding VIII. The judgment itself likewise contains the identical inconsistency—(pars. 5, 6, and 7). The respondent bank seeks to avoid the effect of these inconsistencies by the contention that conclusion IV and the similar provision in the judgment, were inserted in response to this respondent's plea of *res judicata* based upon the orders by the superior court settling its current accounts as testamentary trustee. As will later appear in the discussion of the question of the personal liability of the trustee, this point is without merit. It follows that since the findings, conclusions and judgment contain contradictory irreconcilable provisions the judgment must be reversed. (*Hollywood Cleaning & P. Co.* v. *Hollywood L. Service,* 217 Cal. 131 [17 Pac. (2d) 712].)

We also agree with appellants' contentions that the evidence is insufficient to support the $30,000 finding, and that the trial court adopted the wrong standards in fixing the amount that should be allowed to Canfield free from the claims of appellants.

■ Under section 859 of the Civil Code the trial court is required to fix the amount necessary for the ''education and support'' of the beneficiary. The statute fixes no standards by which the amounts necessary for these purposes are to be ascertained. As was pointed out on the prior Canfield' appeal, in ascertaining the proper allowance, the courts of New York and of this state have held that the beneficiary is entitled to receive free from the claims of his creditors sufficient income to support himself and those dependent upon him, according to the mode of life to which they have been accustomed, and to care for any affliction from which he or his family may be suffering. No set sum can be fixed to apply to all cases. The amount varies according to the station in life of the beneficiary. This does not mean, however, that the needs of the beneficiary are to be measured by his extravagance or his ability to spend. It does not mean that an allowance is to be made for extravagant entertaining, and for unbridled luxuries. The manner of living of the beneficiary in the past, if such living was unreasonably extravagant and profuse, is no criterion of the reasonable amount necessary for support and maintenance. Evidence as to cost of living, wages of servants, medical expense and reasonable entertainment, and other reasonably necessary expenses, fixes the amount.

One of the leading cases on the subject, reviewing many of the early New York cases, is *Tolles* v. *Wood*, 99 N. Y. 616 [1 N. E. 251]. In that case after pointing out that under the New York statute from which section 859 of the Civil Code was copied, the question is the amount necessary for the support of the beneficiary, the court stated: (p. 255)

''In *Sillick* v. *Mason*, 2 Barb. Ch. 79, the chancellor said: 'The interest of the *cestui que trust* in such a trust as this, beyond what may be necessary for the support of himself and family, may be reached by a creditors' bill and applied to the payment of his debts.' The case showed that the beneficiary had lived in his father's family, uneducated to any business, and entertaining the idea that a fortune would be provided for him, and had a wife whom he supported. The chancellor said: ' . . . And they should not, upon a fair construction of the statute on the subject, be permitted to

indulge in extravagant expenditures while the defendant's creditors remain unpaid.'

"The question in this case was objectionable in assuming that the manner of life which Mr. Wood had been in the habit of leading was one of the conditions upon which the amount necessary for his support was to be predicated. His manner of life had been shown by his cousin, and co-trustee and defendant as recklessly extravagant and profuse, and the evidence of all of his witnesses showed that a large part of his annual expenses were incurred in repaying his supposed obligations for social courtesies and civilities extended to him by his associates and acquaintances. However pleasant and agreeable it may be for individuals to incur and repay such obligations, the law is concerned only with real obligations and necessary expenditures, and cannot properly estimate or determine the amount which, according to social requirements, an individual should lavish or expend in voluntary entertainments in repayment of conventional obligations. Doubtless the court may take into account, to a certain extent, the difference existing in the education, habits, and condition of individuals, with a view of ascertaining their respective necessities and wants, in order to determine the amount which may be necessary to supply them; but even in that case, I apprehend, it cannot go beyond the sum needed to discharge real obligations, and pay proper and reasonable expenses for necessary support.

"The evidence sought by the question objected to furnished no information upon the issue tried by the court. Neither the manner in which the party has been accustomed to live, nor the style in which his associates and acquaintances expect him to live, furnishes a just criterion for determining the amount necessary to furnish a suitable support to the *cestui que trust.*" And again at page 256:

"It seems to us that the question in issue here was one peculiarly proper for the determination of a court or jury, after hearing evidence as to the character, circumstances, and condition of the party, and the price and value of articles required to furnish suitable food, clothing, shelter and other necessaries adapted to the condition in life of the person whose support is the subject of inquiry. . . . The subject is one of which every individual has had more or less experi-

ence and knowledge, and is neither adapted to nor requires the opinion of persons in special classes of life to elucidate or explain. . . . Few subjects exist where knowledge and information concerning them are so universal and general as those pertaining to the cost and expense of living, and where all are so competent to form an opinion with respect to them. Such questions must, not only from the nature of the subject, but also from the requirements of law, be left to the judgment and experience of the tribunal before whom they are tried."

In *Magner* v. *Crooks*, 139 Cal. 640 [73 Pac. 585], this court adopted the station in life rule, holding that an income of $1.60 per month from a trust should be exempt from claims of creditors under section 859 of the Civil Code where it was shown that the beneficiary was married; had an invalid wife and two children; was himself suffering from Bright's disease; and that he was brought up by wealthy parents.

There are several cases from New York worth mentioning on this issue. In *Sillick* v. *Mason,* (N. Y.) 2 Barb. Ch. 79, $2,000 of a $2,500 income was held to be exempt, the court emphasizing that the beneficiary was reared in the expectation of ultimately receiving a fortune. In *Scott* v. *Nevius,* (N. Y. 1857) (6 Duer, 672) the court stated that the creditor could reach the surplus of the income "not required for the judgment debtor, taking into view his condition in life, his health and other circumstances and the condition of his family, if any he have". In *Genet* v. *Beekman,* (N. Y. 1865) 45 Barb. 382, a $1,000 annual income was held totally exempt, the court pointing out that the courts should not place too severe restraint upon expenditures by the beneficiary. In *Moulton* v. *de Ma Carty,* (1866) 6 Rob. (29 N. Y. Super. Ct.) 533, an annual income of $5,000 was held exempt, the court pointing out that the beneficiary had been reared to a life of "leisure" and "refined tastes". In *Tolles* v. *Wood,* (1885) *supra,* it was held that sums paid by the trustee as interest on certain debts of the beneficiary, and on life insurance policies given to secure certain of his debts, were not necessary for the support of the beneficiary. In *Kilroy* v. *Wood,* (1886, N. Y.) 42 Hun, 636, 638, other creditors sought to reach the income of the same trust involved in the Tolles case. A $3,750 annual income was held exempt. The court

pointed out that the beneficiary is "a gentleman of high social standing, whose associations are chiefly with men of leisure, and is connected with a number of clubs, with the usages and customs of which he seems to be in harmony both in practice and expenditure, and it is insisted on his behalf that his income is not more than sufficient to maintain his position according to his education, habits and associations". In commenting on this case, and a later New York one, Griswold in his work "Spendthrift Trusts" at page 346 states:

"If this statement does not represent the extreme, it certainly was reached a few years later in *Stow* v. *Chapin*, (1889) 51 Hun, 640 [4 N. Y. Supp. 496], where a creditor was not allowed to reach the surplus of an income of $25,000.00 payable to a beneficiary who was unmarried, and had no children to support, and no house to maintain." Professor Costigan refers to these two cases as being "clearly discriminatory" and as being "indefensible". (22 Cal. Law Review, 471, 485; see, also, *Brearley School* v. *Ward*, (1911) 201 N. Y. 358 [94 N. E. 1001, Ann. Cas. 1912B, 251, 40 L. R. A. (N. S.) 1215].) Other New York cases are collected in Griswold, "Spendthrift Trusts," page 347 et seq. See, also, Gray, "Restraints on Alienation" (2d ed.), page x, Clark, "Spendthrift Trusts" in New York, 9 Bench & Bar, (N. S.) 6, 68.

From a reading of the New York cases, omitting the extreme cases above mentioned, it will be observed that on the whole the courts of that state have applied common sense in fixing the amount to be exempt predicated upon the station-in-life rule. No absolute fixed sum can be used to apply to all cases.

The cost of living, cost of housing, medical cost, the manner in which the beneficiary has been reared, the number and health of his dependents, his own health, his entire background—all these and perhaps others should be considered. But cost of lavish entertaining, cost of betting on race horses and cost of obvious luxuries, etc.—these are all false factors.

 In the present case the trial court has determined that $30,000 a year is necessary to support the beneficiary, and that sum is made exempt from the claims of creditors. Tested by the standards already set forth, a reading of the record discloses that there is no substantial evidence to support the challenged finding. The following is a summary of

all of the evidence offered on this phase of the case. As will be noted, most of the evidence is very general. Joseph Rosenthal, called by Charles O. Canfield, testified that he first met Charles in 1907 during the Ascot race track season; that Charles was then interested in horses; that in the past four years he had seen Charles many times and was conversant with his living habits; that he had visited at Charles' home; that he had observed two or three servants; that Charles owned several automobiles; that Canfield ''lived well''. Charles O. Canfield, called under section 2055 of the Code of Civil Procedure by Pearl Canfield, testified that in the divorce action he had filed an affidavit which set forth the amount necessary for his support and maintenance; that said affidavit was filed August 3, 1931, and recited that ''affiant has estimated the living expenses of his wife and himself at \$18,-000.00 per annum . . . and includes traveling expenses and miscellaneous expenses, such as physician.'s bills, hospital bills, clothing for himself and wife, upkeep of the home now occupied by affiant and his wife . . . together with payment of wages to servants, and miscellaneous articles required by affiant and his wife. In addition this sum covers court costs, witness fees, payments for depositions, reporter's fees, including payments for transcripts and briefs on appeal, as affiant is engaged in numerous important lawsuits . . . '' Charles O. Canfield's attorney stipulated that the above portion of the affidavit was ''true and correct at the time the affidavit was filed''. Charles further testified that cost of living has gone up since 1931, and that medical expenses have been higher, but he had no specific data on any of these items; that his expenses in 1932, 1933 and 1934 were substantially the same as in 1931; that in 1935 he had a large income tax to pay for the years 1927–1930 and his medical expenses were larger; that increased expenses for this year totalled \$6,000 to \$7,500; that his father had died in 1913; that for twenty years, at least, prior to that time he had not lived at home; that he could not itemize his maintenance costs; that since 1914 he has spent every cent allocated to him in maintaining himself in the station in life to which he had been accustomed to live; that in 1921–1923 he lived at the Ambassador Hotel with his then wife Pearl Canfield paying \$45 rent per day; that he entertained frequently in that period; that he and his wife

at that time took many trips; that several years later he moved to the Talmadge Apartments; that there he paid $650 a month rent and spent $6,400 in remodeling the place; that he entertained frequently; that he bought expensive furniture; that it cost him over $100,000 to furnish this apartment; that he separated from Pearl Canfield in 1925 and lived for a while in New York; that his sisters shared an estate of between 16 to 18 million dollars; that he has been ill since 1929; that he has employed many doctors and spent some time in hospitals; that his present wife was ill in 1935, but is now getting well; that he has several lawsuits pending that have cost large sums of money for attorneys' fees and costs; that his present wife belongs to many clubs and organizations; that he spends considerable money on club dues; that he carries some life insurance; that the premiums total $3,000 a year; that the Security Bank is beneficiary of a $40,000 policy; that his present wife is a beneficiary; that under court order Pearl Canfield is a beneficiary of other policies. On examination by the Security Bank's counsel he testified the $18,000 set forth in the affidavit did not cover taxes, insurance and repairs on his home; that from 1931 on he spent every cent he received and had no surplus income at all; that if all the items of expense were added to the $18,000 his expenses were in fact $63,000 per year.

Mrs. Lloyd Nix, called by defendants, testified she has known Charles O. Canfield and his present wife for about five years; that she has been frequently at their home; that "Mr. and Mrs. Canfield I think are two of the most charming hosts in the City of Los Angeles. They entertain in a most lavish manner; no expense is spared to entertain their guests and their—the very finest entertainers are brought in . . . "; that she has frequently been a visitor at the homes of the wealthy; that from this fact and from her own knowledge she knows what it costs to maintain a home such as that maintained by the Canfields; that to maintain such a home and to entertain as they do costs at least $5,000 a month. On cross-examination she admitted she had no personal knowledge of the Canfields' expenses stating "what the expenses were of their home, I would not be so rude as to do that . . . "; that the clothing and jewelry Mrs. Canfield must wear in the society with which she travels costs a great deal;

that she could not allocate the various expenses estimated by her at $5,000 per month; that such estimate was based on her general knowledge; that ever since she has known Mr. Canfield ''he has always lived extravagantly''; that the parties she attended at the Canfields' house must have cost three hundred or four hundred dollars each; that he gives such parties ''very, very often. They do a great deal of entertaining . . .''; that at an average party between fifteen and fifty people were invited as guests; that at such parties there is ''always a doorman and lavish floral arrangements''; that there are always entertainers; that they serve marvelous food; that the food cost must be at least $3.50 per plate exclusive of beverages; that the very best cocktails and ''all that sort of thing'' were served; that they have two servants.

Charles was then recalled by respondent bank and testified that every cent he has received from the trust has gone for ''necessities of life'' and other miscellaneous items; that until 1925, when he separated from Pearl Canfield, she participated with him in living on the scale of life just described; that he and his present wife have continued to live on that scale, except that the income has been less; that they now live ''as well as we can on the income that is there now''. On cross-examination he testified that for the past two or three years he has lived in Los Angeles in a home on which the respondent bank has a trust deed; that his wife has purchased the property; that he pays no rent as such but pays upkeep, taxes and interest on the loan on the property; that he has spent $10,000 repairing the place; that prior to that he lived at a home owned by his wife's mother; that his present wife has an independent income of her own, but how much he doesn't know; that he couldn't detail his expenditures even for the past month; that he spent all he received; that he has no charge accounts but pays cash for everything; that he keeps no account of his expenditures; that ''I have been playing the races all my life'' and that costs some money; that he has no income at all other than from the trust unless he happens to be lucky and win at the races. This testimony was generally corroborated by Pearl Canfield.

Frank Garbutt, called by Charles O. Canfield, testified that he knew the Canfields well; that from 1922–1936 Charles lived well; that ''he was well dressed, spent money freely'';

that he attended sporting events and sat in the "ten and twenty dollar seats".

That is a fair summary of all of the evidence. It is to be noted that Charles himself testified that from 1931–1934 his maintenance expense, including the items set forth in his affidavit, did not exceed $18,000 and in 1935 was between six and seven and a half thousand more. Appellant Canfield in her briefs stipulates that an $18,000 per year allowance would be reasonable. The other appellants do not join in this stipulation.

It is obvious that the above evidence does not sustain the finding that $30,000 per year is necessary for Charles O. Canfield's support. The amount necessary for his support is not to be measured by his ability to spend. It is to be measured by his reasonable needs. Such needs do not include extravagances or luxuries, nor the expenses for lavish entertainment, nor gambling losses. He is entitled to support himself and family in reasonable comfort, but not in extravagant luxury. In determining the amount the trial court on the retrial will consider all of the factors heretofore mentioned in this opinion.

For the purposes of the retrial it is necessary to pass on the question of the personal liability of the trustee, and also on the question of the priority between appellants. The trial court held that the service of process did not "effect equitable liens . . . upon any income of said trust payable to the said Charles O. Canfield at the time of service of process in said respective actions, or at any time prior to judgment herein"; that the equitable liens of appellants shall become operative from the date of entry of the judgment; that the trustee was not personally liable by reason of it having paid Charles all of the net income of the trust after service of process; that after date of entry of judgment appellants have equitable liens upon all income allocated to Charles in excess of $30,000 per year; that as between themselves appellants' liens have priority as follows: First, Pearl S. Canfield; second, Pauline Cato; third, Bank of America.

In so far as the trial court held that the equitable liens of appellants did not attach on the respective dates that summons in each action was served on the bank the trial court was clearly in error. The record discloses that after

service of summons in each of the respective actions the trustee continued to pay to Charles O. Canfield large sums of money totalling to the date of judgment over $150,000. In so far as the sums so paid exceeded whatever sum may be determined to be the amount necessary for the reasonable needs of Charles O. Canfield, the trustee violated the rights of appellants and must be held personally liable therefor. The trustee could have protected itself by payment of the income allocated by it to Charles into court as expressly prayed for in the Pearl Canfield complaint.

On principle and authority, in view of the provisions of section 859 of the Civil Code, upon the filing of the complaints, and upon service on the trustee, the plaintiffs secured equitable liens on all future surplus income allocated to the beneficiary by the trustee. The plaintiffs when they filed their complaints were judgment creditors of Charles. ▉ Section 859 of the Civil Code expressly provides that the surplus income "is liable to the claims of creditors . . . in the same manner as personal property which cannot be reached by execution". Actions under this section are equitable in nature. They are in effect creditors' bills to reach equitable assets. Such a proceeding is *quasi in rem* and creates an equitable lien on the property which it seeks to reach from the moment of service of process. As was stated in *Seymour* v. *McAvoy,* 121 Cal. 438, 441. [53 Pac. 946, 41 L. R. A. 544] : "A judgment creditor, by filing a bill in equity to subject equitable assets to the payment of his judgment, acquires an equitable lien on such assets and a priority over any other creditor who has not already filed such a bill." That case was one by a judgment creditor to reach in the hands of the trustee, income of a spendthrift trust. The trust was created in 1869 prior to the adoption of section 859 of the Civil Code. The court refused to give retroactive effect to section 859, and so the creditor in that action did not prevail.

In *Tolles* v. *Wood, supra,* 252, a case where a judgment creditor was seeking to reach surplus income of a beneficiary of a discretionary spendthrift trust, the court stated:

"The creditor of such a beneficiary acquires a lien upon the accrued and unexpended surplus income, *or that subsequently arising from such a fund,* superior to the claims

of general creditors or assignees of the *cestui que trust,* by the commencement of the action in equity to reach and appropriate it to the satisfaction of his judgment." See, also, *Spellman* v. *Sullivian,* 43 Fed. (2d) 762; *Metcalf Bros.* v. *Barker,* 187 U. S. 165 [23 Sup. Ct. 67, 47 L. Ed. 122].

Under these cases, by disregarding appellants' rights, and paying the entire income over to Charles after service of summons upon it, the trustee became liable to the appellants in its personal capacity. In addition to the authorities already cited, the Restatement of the Law of Trusts, section 155, expressly so provides. Section 155 is the section dealing with discretionary trusts. It provides in subsection two that:

"Unless a valid restraint on alienation has been imposed in accordance with the rules stated in sections 152 and 153, *if the trustee pays to or applies for the beneficiary any part of the income* or principal with knowledge of the transfer *or after he has been served with process in a proceeding by a creditor to reach it, he is liable to such transferee or creditor.*" In the comment on subsection two it is stated:

"Although in the case of a discretionary trust a transferee or creditor of the beneficiary cannot compel the trustee to pay over any part of the trust property to him, yet if the trustee does pay over or apply any part of the trust property to the beneficiary with knowledge that he has transferred his interest or after the trustee has been served with process in a proceeding by a creditor of the beneficiary to reach his interest, the trustee is personally liable to the transferee or creditor for the amount so paid or applied, except so far as a valid provision for forfeiture for alienation or restraint on alienation has been imposed. . . . " As already indicated, under section 859 of the Civil Code, the extent of the valid restraint on alienation that is permitted in California, is the amount reasonably necessary for the education and support of the beneficiary—beyond that, the trustee is personally liable if it pays any sums over these amounts to the beneficiary after receipt of service of process.

 Although it is true as urged by respondents that the restatement does not constitute a binding authority, considering the circumstances under which it has been drafted, and its purposes, in the absence of a contrary

statute or decision in this state, it is entitled to great consideration as an argumentative authority. It purports to accurately reflect the general common law of the United States, and where there is a conflict, to state the general and better rule on any given subject. For these reasons, in the absence of contrary authority in this state, and in view of the *dicta* in the Seymour case, *supra,* and in view of the soundness of the doctrine announced, we are inclined to and do follow the rule announced in section 155.

Respondent trustee urges that a creditor's bill will not lie, because the beneficiary of a discretionary trust has no enforceable interest in the income. This is so until such income has been allocated to the beneficiary. Neither the beneficiary nor the creditor can compel such allocation, but after it has been allocated the creditors can prevent its payment to the beneficiary, as already discussed at length. After allocation of the income and after the trustee exercised its discretion, Charles O. Canfield had the equitable right under this trust to have the payments made to him, and it is this equitable right to which the lien of appellants attached.

The argument that a creditor's bill only reaches income allocated at the time of service of process, and does not reach subsequently acquired and allocated income is obviously unsound, and is completely answered by *Tolles* v. *Wood, supra.*

The trustee urges many other reasons why it should not be held personally liable for having paid the entire income to Charles after service of process upon it, and thus effectively deprived appellants of payment of their judgments. We have considered all these objections and find them all to be without merit. Many of them are so clearly unsound as not to warrant further discussion. Most of them have been answered in the discussion, *supra,* dealing with the interpretation of section 859 of the Civil Code, and in the discussion of the nature of the beneficiary's interest and the creditors' rights to the surplus income of a discretionary spendthrift trust. Several of the points, however, require some mention.

In the Pearl Canfield divorce action Pearl Canfield secured the appointment of a receiver for the purpose of having the trustee make payments to Charles only in the

presence of the receiver. This order appointing the receiver was later vacated with prejudice. It is contended that this order by the trial court was entered on the theory that the trust income could not be reached by Pearl Canfield; that as to Charles O. Canfield and Pearl Canfield the entire subject of the liability of the trust is *res judicata,* and that such defense is available to the trustee. A similar argument is predicated upon a denial of an injunction requested by Pearl Canfield (by another department of the superior court) in the other action.

The obvious answer to these contentions is that the liability of the trustee to creditors of the beneficiary, and the liability of the trust for payments due Pearl, were not involved or adjudicated in the receivership or injunction proceedings. The court in those proceedings apparently only determined it had *no jurisdiction over the trustee.* This left Pearl Canfield with her proper remedy—a proceeding under section 859 of the Civil Code.

Respondent trustee also claims that the record discloses that it as trustee filed reports and accounts current with the proper court dealing with the period after the filing of the Pearl Canfield action; that these reports and accounts disclosed that the entire net income of the trust had been paid to Charles Canfield; and that the court entered its orders settling and approving the accounts. It is contended that these orders settling these reports and accounts, having become final, constitute adjudications *in rem* in favor of the trustee of the lawfulness of the payments made to Charles, and of the propriety of the failure to make payments to anyone else—including all of the appellants. The trustee relies on the rule that a trustee's accounting is a proceeding *in rem.* (*Security-First Nat. Bank* v. *Superior Court,* 1 Cal. (2d) 749 [37 Pac. (2d) 69]; *Ringwalt* v. *Bank of America etc. Assn.,* 3 Cal. (2d) 680 [45 Pac. (2d) 967].) It contends that in those proceedings the propriety of disbursements was properly passed upon; that such adjudication is binding on all parties in interest; that the probate jurisdiction extends to granting relief under section 859 of the Civil Code; that the creditor of a beneficiary is therefore a person in interest in the accounting proceedings who could have appeared therein; that not having done so he is barred by the final orders in those proceedings.

The entire fallacy of this line of argument is apparent. Appellants' rights are given to them by section 859 of the Civil Code—that is by creditor's bill in equity. All of the accounts and orders referred to by the trustee were filed and approved, and covered periods, subsequent to the filing of the Pearl Canfield complaint. In none of those accounts was any reference made to any indebtedness due any of the appellants, nor to the filing of the various superior court actions by appellants. Clearly the probate court, in passing on the accounts of respondent trustee, did not purport to pass on the propriety of appellants' claims. The probate court had no jurisdiction of the issues involved in these cases. The creditors of the beneficiary were not parties in interest in the accounting proceedings. Assuming, without deciding, that the probate court, had this matter been properly presented to it, could have granted the equitable relief here involved, its jurisdiction is not exclusive. (*Kingsbury* v. *Ross,* 217 Cal. 484 [19 Pac. (2d) 784]; *McGee* v. *Allen* (*Southwestern Creditors Assn.* v. *Allen*), 7 Cal. (2d) 468 [60 Pac. (2d) 1026].) Moreover, it is equally obvious that in approving the accounts the probate court did not attempt to decide, nor could it decide, what Charles Canfield's station in life was or what was necessary for his support.

The other points raised by respondents on this issue have all been considered and found to be without merit. In holding that the trustee is personally liable to the appellants for all sums paid to Charles after service of summons upon it in excess of what is ultimately determined to be a reasonable sum for his support, we do not decide whether after payment to the appellants the trustee is entitled to reimbursement from the trust for such expenditures. That is a matter which will have to be determined in a proceeding between the beneficiary and trustee, and is not now involved.

As to the priority between the respective appellants, it is clear that under the circumstances here disclosed appellants are entitled to priority between themselves based upon the priority of the filing of the respective complaints. It is the contention of appellants Cato and Bank of America that each of these actions must be considered as a creditor's bill for the benefit of *all* the creditors, and that all the equitable liens must be deemed effective from the date of the

filing of the first complaint. It is well settled that where a creditor discovers and uncovers property which could not be seized on execution he acquires a lien on such property and becomes entitled to the satisfaction of his judgment out of such property in preference to other creditors. (See 15 Cor. Jur., sec. 183, p. 1441, and cases cited.) It is contended that this rule is only applied to cases in which there has been a concealment or a fraudulent conveyance, and that priority is only accorded as a reward for uncovering secreted assets. No such qualification is suggested in *Seymour* v. *McAvoy, supra,* 441, where it is stated in referring to this type of action:

"A judgment creditor, by filing a bill in equity to subject equitable assets to the payment of his judgment, acquires an equitable lien on such assets and a priority over any other creditor who has not already filed such a bill." (See, also, *Title Ins. etc. Co.* v. *California Dev. Co.,* 171 Cal. 173 [152 Pac. 542].) Moreover, even if priority can only be recognized as a reward of diligence, clearly the present case presents such a situation. Pearl Canfield, by the ingenuity and persistence of her counsel, as a result of this long drawn out litigation, has uncovered an asset apparently unknown to other creditors.

The many other points raised and discussed by counsel, in view of our disposition of the main points involved on this appeal, need not be discussed.

For the foregoing reasons the consolidated judgment appealed from is reversed, with instructions to the trial court to proceed with the views herein expressed.

Curtis, J., Seawell, J., Nourse, J., *pro tem.,* and Shenk, J., concurred.

Edmonds, Houser and Langdon, JJ., did not participate in the consideration and decision of these cases. Nourse, J., sitting *pro tem.,* for the latter justice who was disqualified.

Rehearing denied.