[Civ. No. 14324. Second Dist., Div. Three. Oct. 3, 1944.]

E. W. MILLER, Appellant, v. LAURA CANFIELD PIERCE, Respondent.

E. W. Miller, in pro. per., and Henry Lockwood for Appellant.

Birger Tinglof and Walter H. Hewicker for Respondent.

WOOD (Parker), J.—This is an action, upon an assigned claim, to recover compensation for legal services rendered by the law firm of McAdoo, Neblett & Warner and its successors. After successive assignments of the claim to various law firms which succeeded the firm of McAdoo, Neblett & Warner, the claim became vested in William H. Neblett. Mr. Neblett assigned the claim to the Bank of America absolutely, and the bank assigned it to plaintiff for purposes of collection. Judgment was for defendant.

The nine causes of action alleged in the second amended complaint, upon which the case was tried, were based upon: (1) an oral agreement made on October 1, 1935, subsequently modified orally on May 25, 1940, to pay $15,000 for services rendered; (2) a written agreement to pay for services rendered; (3) an agreement in writing to pay $15,000 for services rendered; (4) an oral agreement made on October 1, 1935, to pay the reasonable value of services rendered, which value was alleged to be $15,000; (5) an oral agreement made on May 25, 1940, whereby defendant allegedly agreed to pay $15,000 for legal services rendered "out of all moneys ordered by the court to be paid in the estate of Charles A. Canfield," and whereby defendant agreed to prosecute the litigation to a final termination in any courts necessary to secure the payment thereof, and upon the alleged breach of that oral agreement by defendant, in that she failed to so prosecute the litigation and failed to pay the necessary costs, whereby Mr. Neblett was precluded from recovering the $15,000; (6) an open book account; (7) an account stated; (8) a balance due on an open and current ac-

count; and (9) the reasonable value of the services rendered.

A testamentary trust, of the approximate value of $1,000,-000 created by Charles A. Canfield for the benefit of his son, Charles O. Canfield, and the two children of that son, became effective in 1914. One of the children is the defendant herein. The other child died in 1915. The trustee, a bank, was directed under the trust to pay $1,200 annually from the income to the son, and was given authority to pay in addition thereto such amounts as in its discretion were necessary for the maintenance of the son and the defendant according to their accustomed stations in life. The trust also provided that there should be no accumulation of the income, and that no part of the income should be distributed to any creditors of the son.

Over a period of five years preceding October 1, 1935, the time when defendant employed the firm of McAdoo, Neblett & Warner, the amount received by the son from the trustee averaged approximately $30,000 annually, and the amount received by the defendant during that time was $250 per month except on occasions when she received $500 per month. (Preceding those five years, from 1917 to 1931, the son received various sums each year varying from approximately $47,000 in 1919, as a minimum, to approximately $101,000 in 1924, as a maximum.) When defendant employed the firm the trust estate was producing approximately $30,000 a year net.

Also preceding the date of said employment of counsel, three judgment creditors of the son were seeking to recover in actions then pending against the trustee about $165,000, in the aggregate, from the income of the trust. The legal theory of those actions was that the income from the trust fund over and above the amounts reasonably necessary to maintain the son and the defendant according to their accustomed stations in life should be applied in payment of those judgments.

Defendant was desirous of obtaining a larger allotment from the trust income. As above stated, the determination of the amount to be paid to her was within the discretion of the trustee. It was apparent that the prospect of obtaining an increase in her allotment would be more favorable if the creditors of the son could not satisfy their claims from the trust income.

It is undisputed that on October 1, 1935, the defendant and the law firm of McAdoo, Neblett & Warner entered into a written agreement whereby defendant employed that firm to represent her in all matters relating to the trust estate of Charles A. Canfield. The agreement was not produced at the trial, the firm having lost the agreement and the defendant having lost her copy of it. Oral evidence as to the contents of the agreement was received at the trial. The court found that the agreement provided that defendant employed that firm to represent her in all matters arising out of the testamentary trust of Charles A. Canfield, including all litigation concerning her rights as such beneficiary, then pending or thereafter commenced; that such services were to continue until all litigation had been completed or until said employment should be terminated by defendant; that defendant should not personally be obligated for any attorneys' fees and should not be obligated to advance any money for costs incurred in any litigation; that said firm would look solely to said trust estate for the ''reasonable value of all fees'' earned by it and for reimbursement for all costs advanced by it, which might be paid to the firm voluntarily by the trustee or which the trustee might be directed to pay the firm by court order. That finding was supported by the evidence. A part of the testimony which supported that finding was given by Mr. Arnold Odlum, an attorney and former member or employee of the firm of McAdoo, Neblett & Warner, who was called as a witness by defendant. He testified that he prepared the agreement and signed it on behalf of that firm; that the agreement provided that the law firm would represent her in all matters of the trust estate of Charles A. Canfield, whether the matters were then pending or whether they would arise later, and that the firm would make no charge against her for costs or fees or advancement and that it would look solely to the trustee for its remuneration and fee, either for such amount as the trustee would advance voluntarily or would be allowed upon order of court. He testified further that Mr. Neblett said he intended to secure the removal of the trustee and that he thought he would be able to represent a successor trustee and that he would look to the trustee for the fees and costs.

After the agreement was made the law firm represented defendant in various matters, and it may be stated generally

that such representation consisted of the following: filing answers (in intervention) for her in the three pending actions by judgment creditors, above referred to, and representing her at the trial wherein the three actions were consolidated for trial; commencing an action by her to remove the trustee and recover a larger allowance; filing an answer for her in the United States District Court in an action, *United States of America* v. *Charles O. Canfield,* wherein it was sought to recover income tax from the trust income, and representing her at the trial; filing an answer for her in an action, *Spitzel* v. *Charles O. Canfield;* filing a petition for determination of her right to an increased allowance; filing exceptions to the 15th, 18th, and 19th accounts of the trustee, and representing her at the hearings thereof; and having many conferences with defendant, the trustee, and the attorneys for the trustee. Some of said actions and proceedings will be discussed more in detail hereinafter.

Appellant (plaintiff) asserts that there was an oral agreement by the parties in May, 1940, fixing the attorneys' fees at $15,000 and that said oral agreement was substituted for the original written agreement of October 1, 1935. Appellant states that the substitution for the prior agreement was evidenced by a petition of respondent (defendant) dated May 31, 1940, and by other evidence introduced at the trial. That petition, prepared by Mr. Neblett and signed by defendant herein, was entitled, ''Petition for Determination of Right to Increased Allowance from Testamentary Trust.'' The part of that petition to which appellant refers particularly is as follows: ''Petitioner has incurred an obligation for the payment of attorneys' fees in the sum of $15,000.00 for services rendered for her by her attorneys in and about the defense and prosecution of the following causes. . . . [Here are listed the 3 consolidated cases above mentioned; the matter of the Estate of Charles A. Canfield, deceased, (relating to general estate matters, including objections to 18th, 19th and other accounts of the trustee) ; an action, *United States of America* v. *Charles O. Canfield* (relating to an income tax claim) ; an action, *MacMillan* v. *Security-First National Bank* (to remove trustee) ; and an action, *Spitzel* v. *Charles O. Canfield* (relating to a creditor's claim against the trust income).] Petitioner and her attorneys have agreed that she pay them $15,000.00, but only out of such monthly installments as the court may fix; not in excess of $300.00 per

month, and such monthly installments to be paid only from monies allowed petitioner in addition to whatever sums the court allows under Six (a)—Six (f) inclusive." (The reference, "Six (a)—Six (f)," is to certain subdivisions of paragraph Six of the petition, which relate to amounts alleged to be necessary for the support of defendant's mother; rent; monthly installment on purchase of house; furniture; living expenses; and taxes.)

Mr. Neblett testified that preceding the filing of that petition there was a discussion about attorneys' fees; that "All of these discussions had fees as an incidental part of them, and the fee that had been hit upon was $25,000.00"; that "after some discussion as to what she needed to support her and to pay her obligations for our fees that we were contending for, $25,000.00, we wrote up a petition in a form that we thought it ought to be put in"; that "it had $25,000.00 in it instead of $15,000.00 for fees, and the first objection she had to it was that $25,000.00 was under the circumstances a severer load than she wanted to undertake. I sent her a bill for $25,000.00 and she came down with her husband and asked me to reduce the bill to $15,000.00, which I did"; that she said $25,000 " was perfectly reasonable, but 'I just don't want to saddle myself with that, but $15,000.00 is all right." She said, " 'I can see where I can pay that, but'—she said 'It would take a whole year, it would take all of my income, to pay $15,000.00 out of the income that would be allotted to me, and if you will allow me to keep a certain amount, keep something to live on in the interim, it will take several years to pay it.' I don't remember a stated time, but she had it all figured out, and so I said 'All right, I will reduce it to $15,000.00,' and I did"; that "the substance of the conversation we had about this $15,000.00 fee was that it was to include payment for everything that we had done for her up to and including the time that this petition was filed"; that defendant's husband was present when the discussions were had concerning the petition; that about five drafts of the petition were prepared before the final one was completed; that defendant said she desired to take the various drafts of the petition with her before signing a petition and submit them to some other attorney; that she did take the proposed petitions away, and upon her return suggested various changes in them.

Respondent testified, concerning the discussion of attorneys' fees which preceded the filing of the petition, that Mr. Neblett did not send her a bill for $25,000 and that the first she heard of the figure of $25,000 was "in the first petition"; that the petition was modified at the suggestion of herself and her husband; that they felt "it was making us personally liable to Colonel Neblett, and we asked for a great many changes to be made before the petition was filed"; that "the conversation was a little heated most of the time . . . and of course we told him [Mr. Neblett] very flatly that we didn't believe that we were obligated to him in any way due to the original agreement that I had made with him, and when we asked him to modify his position, he didn't like it"; that she received the first bill (being for $15,000) from him in 1939, and she and her husband saw him about the bill soon thereafter, and told him "that he had no right to send the bill and he just said, 'Just ignore the bill and tear it up, I was afraid that you might be getting another attorney, and I was just trying to establish the fact that I was your attorney"; that she referred to the fact that when she "first went into his office that he had agreed to handle all my affairs on a contingent basis, and that he was to get whatever compensation he was entitled to from the trust," and told him that "I felt that I didn't owe him," and he said, "Destroy the bill; I just sent it to establish that I am your attorney"; that she received another bill for $15,000 from him about May 14, 1940, with a credit of $250 thereon; that she and her husband saw him about the bill within a day or two thereafter, and she told him the same thing she had told him when they discussed the first bill, and in addition thereto said that she "couldn't understand why he insisted on mailing a bill to her when she was not obligated to him; that she asked him "why, if I didn't owe him anything, why he was making a credit for $250"—that, "The only money I gave you represented a loan"; that Mr. Neblett said the credit was in payment of what he owed her and "Just ignore those bills"; that, upon his request, she had made loans of $250, and $75 and $50 to him, but at the time that bill was received only $250 had been lent him; that he said that $250 was a loan and that "when he received the money from the trust he would see that I got it back"; that she received another bill for $15,000 from him about January 9, 1940, with a credit

of $325 thereon; that in discussing that bill with him she said the same thing she had said concerning the other bills, and that she also said to him, "I felt that he knew that it was a personal loan and how he could figure it as a payment and credit on the bill was ridiculous, because I didn't owe him any money in the first place, and it was purely a loan and not a payment on any bill at all," and that he owed her $375 instead of $325 that he had put on the bill; that he said the credits were loans and he would pay the $375 when he received the money from the trust.

Respondent's husband gave testimony that was substantially the same as the testimony given by respondent. He testified further that there was some argument with Mr. Neblett concerning their request for a change in the form of the petition, and Mr. Neblett said that "regardless of whether he accepted it as he drew it or as we drew it, it meant the same thing; that he could not collect his fee except from the trustee." The husband also testified that during the conversation relative to the bill of May 14, 1940, Mr. Neblett "stated that as we were drawing a new petition which provided that she was not liable for any fee personally, that naturally that bill did not mean anything." In answer to the question: "Was there any discussion at that time with respect to the original contract of employment of Neblett by your wife?" he said, "Only in the respect that this petition was to cover the original agreement."

The court found that the allegation of the complaint, "That on or about May 25, 1940 ... defendant further orally agreed as a modification" of said original agreement of employment, "in addition to the terms thereof, and as compensation for all of the services rendered thereunder, from said October 1, 1935 to said May 25, 1940, to pay to those entitled thereto, and that the same was due thereunder, the sum of $15,000.00," was untrue. The evidence was sufficient to support that finding. The contention of appellant that an oral agreement was substituted for the original agreement is not sustained. It was not alleged in the second amended complaint, nor was it proved or claimed at the trial, as a foundation for an alleged substitution of another contract, that the original written agreement was abandoned by the parties thereto. The allegation was that "defendant further orally agreed as a modification, in addition to the terms thereof, and as compensation ... from said October 1, 1935 to said May

25, 1940, to pay . . . the sum of $15,000.00.'' The original agreement of October 1, 1935, did not provide that defendant would be liable personally for attorneys' fees, but on the contrary provided that the law firm would look solely to the trustee for its remuneration, either for payment voluntarily by the trustee or for payment by the trustee upon order of court. The trustee did not pay voluntarily or upon order of court for the alleged services herein. The petition of May 31, 1940, also stated that the attorneys' fees were to be paid ''only out of such monthly installments as the court may fix.'' The ''monthly installments'' so referred to were contemplated installments from the trust. The court did not fix the amount of any installments, or order that any installments or sum be paid to defendant or her counsel for attorneys' fees or at all. The said petition was not brought on for hearing, but was dismissed without prejudice on October 30, 1940. (Mr. Neblett stated that the reason for the dismissal was that he contemplated presenting the same contention under exceptions to the 19th account of the trustee.) It was necessary, of course, if the attorneys' fees were to be paid from the trust under an order of court, rather than voluntarily by the trustee, that someone petition the court for such an order. Since the original agreement provided, as one of the alternative methods by which the law firm was to receive payment from the trustee, that it might be upon an order of court, it was within the contemplation of the parties to the agreement that defendant would cooperate with the law firm, in obtaining payment under that method, by petitioning the court for fees to be paid from the trust. The fact that the petition stated that this defendant had ''incurred an obligation for the payment of attorneys' fees in the sum of $15,000.00'' did not mean, in view of the express provision in the same petition that the payment thereof was to be made only from the trust upon order of court, that she was liable personally for the payment of the obligation. As above shown, the documentary evidence, that is, the original written agreement and the petition for a larger allowance, showed that defendant was not liable personally for attorneys' fees. Also as above shown, the oral evidence, as to whether there was an oral modification of the original agreement whereby defendant became personally liable, was conflicting, and the trial court upon substantial evidence to support its finding

found that there was no such modification. That finding cannot be disturbed on appeal.

Another contention of appellant is that he is entitled to recover on a quantum meruit by reason of the breach by respondent of the agreement for attorneys' fees. He asserts that the breach consisted in the refusal of defendant herein to proceed with the appeal from an order made by Judge Burnell in the matter of the *Estate of Charles A. Canfield,* overruling her objections to the 19th account of the trustee and denying her counterpetition for instructions to the trustee. He states that such refusal prevented the earning of the fees in the manner provided in the agreement. A notice of appeal was filed, but a record on appeal was not filed.

Mr. Neblett testified that the substance of his conversations with defendant regarding the appeal was that Judge Burnell's decision was clearly erroneous, that an appeal would reverse it, and if reversed she would get the balance of the income over $14,500, and if she did not appeal the order would stand; that if the order stood the trustee would pay the income above $14,500 to Pearl Canfield, the second and former wife of Charles O. Canfield, in satisfaction of her judgment for unpaid alimony, except possibly the $500 per month to defendant; that it would be a lasting effect to her detriment if she did not appeal; that defendant said she didn't want him (Mr. Neblett) to appeal it, and that she would handle it herself; that after a few days she said, " 'I will appeal if you will agree to pay costs,' " and he said he would not do that, "it was never our agreement—there was never any arrangement for me to pay costs for her"; that he told her that the costs was an afterthought to get him out of the case without paying him any fee; that he told defendant that since he was going into the army soon that he was associating Mr. E. W. Miller, the appellant, with him in the case and that Mr. Miller would handle it, and that she said that was satisfactory.

Mr. E. W. Miller testified that he talked with defendant five times by telephone concerning the appeal and she said: that she did not know that an appeal was wanted, and did not know that it would get her anywhere; that she was not able to pay the $135 costs in the appeal; that she was not obligated to pay costs, and if Mr. Neblett could see his way

clear to appeal and pay the costs, she would be glad to have him do that; that she wanted the appeal dropped.

Defendant testified, concerning the appeal, that Mr. Neblett said he would be able to reverse the Judge Burnell decision and not to waste any time in filing an appeal; that he said the costs would be $135, and she said she could not afford to pay them; that he said he could not pay them either; that he said he had agreed to pay them, and he would take care of it; that on another occasion he said that since she was not willing to protect her interests she should employ another attorney; that she replied that he had agreed to handle her case and pay all costs, that was what she intended that he should do and she had no intention of firing him; that she told Mr. Miller by telephone, in response to a letter she had received, that the only reason the appeal had not been made was that Mr. Neblett had refused to finance it and she could not finance it, but she had not discharged him; that if they would finance the appeal she was willing to go ahead with it.

As above shown, the court found that the written agreement of employment provided that defendant should not personally be obligated for costs incurred in any litigation. The court also found that the defendant never agreed at any time, under the agreement of employment or otherise, to advance any costs in any litigation. The court also found that William H. Neblett, on or about March 13, 1941, breached the terms and conditions of the written agreement of employwent in that he abandoned the litigation contemplated by the written agreement without cause. The evidence was legally sufficient to support those findings. The contention of appellant that he is entitled to recover on a quantum meruit is not sustained.

Another contention of appellant is there is no evidence to support the finding of the court that the allegation of the second amended complaint, ''That the reasonable value of the said services of said McAdoo, Neblett & Warner, a co-partnership, and Neblett, Warner & McDonald, a co-partnership, and said Wm. H. Neblett, and each and all of the members of said co-partnership, was in the sum of at least $15,000.00,'' is untrue. He also contends there is no evidence to support the finding that ''none of the services mentioned in plaintiff's Second Amended Complaint were of any value to the defendant herein.'' The original files in the various actions, hereinabove referred to, wherein the law firms or

Mr. Neblett represented the defendant were received in evi-- dence. It is necessary in considering these contentions to refer to those actions in more detail than hereinabove noted.

 One of the above mentioned judgment creditors of Charles O. Canfield at the date of employment of counsel was Pearl Canfield, his former wife, who had obtained judgment against him for unpaid alimony in the approximate sum of $108,000. In 1931 she commenced an action against the trustee to recover upon that judgment. The trustee's demurrer to her complaint had been sustained by the trial court without leave to amend, and a judgment of dismissal was entered. On July 5, 1935, that judgment was reversed on appeal (*Canfield* v. *Security-First Nat. Bk.* (1935), 8 Cal. App. 277 [48 P.2d 133]), the court holding that a judgment creditor of the beneficiary of a discretionary spendthrift trust of the kind involved herein can reach the surplus of the income of the trust in the hands of the trustee beyond the amount necessary for the support of the beneficiary. At the date of employment of counsel the action was awaiting trial. Defendant, through the legal services of said law firm, intervened in that action and asserted that the trustee was not authorized to allocate any income to Charles O. Canfield in excess of the amount necessary to maintain him according to his accustomed station in life and that the income over and above that amount should be allocated to defendant in order that the wishes of the trustor, that no part of the income should be paid to the son's creditors might be fulfilled.

The defendant also intervened in the other two actions by judgment creditors, above referred to, and the three actions by judgment creditors were consolidated for trial. The said law firm represented defendant herein (the intervener therein) in that trial. The trial court found that $30,000 a year was necessary for the support of Charles O. Canfield in order to maintain him in the station in life to which he had been accustomed, and exempted that annual sum from the claim of said judgment creditors. The plaintiffs in those actions appealed from the judgment. Defendant herein also appealed from the judgment, but later dismissed her appeal. The reason for the dismissal, according to the testimony of Mr. Neblett, was that a stipulation had been entered into that the judgment on appeal should not be res judicata as to her. On appeal the Supreme Court held (*Can-*

*field* v. *Security-First Nat. Bk.* (1939), 13 Cal.2d 1, 20 [87 P.2d 830]) that the evidence was insufficient to support said finding, just referred to, to the effect that $30,000 was necessary for the support of Charles O. Canfield. After the service of summons in each of said three actions the trustee continued to pay to the son sums totaling over $150,000. The court on appeal also held that insofar as the sums so paid exceeded whatever sum may be determined to be the amount necessary for the reasonable needs of the son, the trustee violated the rights of the plaintiffs (appellants) in those actions and must be held personally liable therefor. The judgment was reversed, and the trial court was directed to determine the amount reasonably necessary to support the son and, having determined that amount, to determine the amount for which the trustee was personally liable.

Upon the retrial it was adjudged on September 27, 1939, that the amount necessary to support the son was $14,500, and that the amount for which the trustee was personally liable was $124,683.96. (The bank, which was the trustee, paid that amount in its individual capacity as a bank to the three judgment creditors. The Supreme Court stated (p. 33) that it did not decide whether the bank was entitled to reimbursement from the trust for the payment, and stated further that the matter of reimbursement would have to be determined between the beneficiary and the trustee. It does not appear herein whether the bank recouped said expenditure from the trust income.)

Also upon the retrial it was adjudged, based upon a stipulation of the parties, "That the decree herein is a final adjudication of all of the rights of the parties to this action, except that the judgment shall not constitute an adjudication of the matters alleged in the second separate and distinct answer and defense of the answer interposed by Laura Elaine Canfield MacMillan [defendant herein] in each of the above entitled cases for the reason that said issues were by stipulation withdrawn at the trial of said actions." In the present trial it was stipulated that defendant was not concluded by the judgment upon said retrial as to her second affirmative defense in the former action. It was alleged in the second affirmative defense that the amount of income paid by the trustee to Charles O. Canfield was grossly disproportionate to the amount of income paid to the intervener [defendant

herein] and that the action of the trustee in paying such an amount to him was arbitrary, not in the proper discretion of the trustee, and not in accord with the terms of said trust; and that an order should be made directing the trustee to pay her not less than $2,000 per month and to pay reasonable compensation to her attorney. The first affirmative defense alleged that none of the income could be the subject of claims of creditors of Charles O. Canfield.

On November 4, 1940, defendant filed objections to the 19th account of the trustee, stating that she objected to the payments over and above the sum of $14,500 per annum to Charles O. Canfield. On that date she also filed a counter-petition for instructions to the trustee, asking that the trustee be directed to pay to defendant herein, subject to claims of creditors of Charles O. Canfield, all of the income above $14,500, except necessary administrative expenses. Upon the hearing before Judge Burnell of defendant's objections to the 19th account of the trustee and of defendant's counter-petition for instructions to the trustee, it was contended by the trustee that by reason of the decision by the Supreme Court in the three consolidated cases by judgment creditors, the issue presented by her in the trial court as an intervener—that she was entitled to the income above that necessary to support Charles O. Canfield—was res judicata since her appeal was not perfected and the issue had been decided adversely to her. It was also contended at that hearing that by reason of the decision on the retrial the issue that this defendant was entitled to the income above $14,500, the amount allowed to Charles O. Canfield, was res judicata. Irrespective of whether those issues were res judicata, the decision of Judge Burnell at that hearing upon her application for an increased allowance was adverse to her and became final. The proceedings in intervention in the three consolidated cases, and the proceeding before Judge Burnell for an increased allowance resulted in no order being made that defendant herein was entitled to a larger allotment. It might be argued that, since the amount allowed to Charles O. Canfield was reduced from $30,000 annually and was limited to $14,500 annually, the litigation was of some benefit to defendant for the reason there would be more income available for distribution to persons other than Charles O. Canfield. The question, however, as to whether the defend-

ant was benefited thereby, in that she did receive the larger allowance which she is now receiving, or in that she might eventually receive a still larger amount, was one of fact for the trial court.

In 1939 defendant's allowance was increased from $250 per month to $500 per month, and in 1941 it was increased to $750 per month. Several years before the agreement was made in 1935, she had received $500 per month for a period of two years and after those two years it was reduced to $250.

Mr. Neblett testified in detail as to the manner in which he negotiated with the trustee on many occasions relative to an increase in defendant's allowance, and he asserted that the increase was obtained by reason of his services.

The defendant testified that prior to the increase of her allowance in 1939 she had written to her aunt, one of the advisory trustees of the trust, and to her uncle by marriage, who had powers of attorney for the whole family and represented the advisory trustees, and asked them to intercede for her in trying to get a larger allowance; that they said they would help her; that she told Mr. Neblett that she felt he was antagonizing the trustee and that "she thought possibly by going in without counsel she could accomplish more"; that she had had conversations with her two aunts, who were advisory trustees, and her uncle, above mentioned, concerning the increase and they said they were going to recommend it.

Defendant's husband testified that he was present when the uncle, above mentioned, said that he and the two aunts had decided to suggest to the trustee that defendant's income be increased to $500 per month. It was a question of fact for the trial court as to whether the law firm or the defendant rendered the service which resulted in an increase of the income.

Another case in which the law firm represented this defendant was *MacMillan* v. *Security-First National Bank*. The plaintiff therein was the defendant Pierce herein (under her former name). It was an action to remove the bank as trustee and was filed March 17, 1936. The trustee resigned December 29, 1939. The action was dismissed by plaintiff July 10, 1940. A new trustee, a trust company, was appointed. It was a question of fact as to whether said action and the other services of the law firm were the cause of the resignation of the trustee, and it was also a question of fact as to whether the change of trustee was of any value to plaintiff.

Another action wherein the law firm represented defendant herein was *United States* v. *Charles O. Canfield,* wherein it was sought to recover income tax from the trust income. An answer was filed by the law firm in behalf of defendant herein who was a defendant therein, and it represented her at the trial. The judgment was that plaintiff recover $33,326.40 from the bank (the trustee) in its individual capacity as a bank. The bank paid the judgment. It does not appear whether the bank as trustee was permitted to, or that it did, recoup said payment from subsequent trust income. It was a question of fact as to whether the legal services therein were of any value to defendant, particularly since the amount of income to be awarded to this defendant was a matter within the discretion of the trustee.

In the case of *Spitzel* v. *Canfield,* a judgment creditor sought to recover from the trust income. The law firm filed an answer therein for this defendant. The action had not been tried when the relation of attorney and client was terminated.

The petition for determination of right to increased allowance filed by Mr. Neblett on behalf of this defendant, as above stated, was not brought on for hearing, but was dismissed by the attorney.

The objections on behalf of this defendant to various accounts of the trustee and to other proceedings in the *Estate of Charles A. Canfield* terminated adversely to her.

Appellant asserts that the findings, last above referred to, to the effect that the legal services were of no value to defendant were unnecessary and gratuitous and should not have been made. Appellant's 4th and 9th causes of action presented the issue as to the reasonable value of the services. The court was required to find upon that issue.

The question as to the reasonable value of the services herein was, as above stated, a question of fact for the trial court, and the evidence being legally sufficient to support the findings to the effect that the services were of no value to defendant, those findings cannot be disturbed on appeal.

The judgment is affirmed.

Desmond, P. J., and Shinn, J., concurred.