[L. A. No. 17490.   In Bank.—October 1, 1940.]

VIVIAN A. HOWARD, Respondent, v. C. A. ADAMS et al., Appellants.

254

Leonard Wilson, Gibson, Dunn & Crutcher, H. F. Prince and Walter G. Danielson for Appellants.

A. Brigham Rose and Alfred M. Einstein for Respondent.

THE COURT.—Action to recover damages for breach of an oral contract for support and maintenance. The jury returned a verdict for plaintiff in the sum of $120,800, and judgment was entered thereon. As a condition of denial of motion for new trial, the court ordered a reduction of the award to $85,727, and upon plaintiff's acceptance of the remission it was incorporated in an order of modification of the judgment. Defendants appealed from the judgment and from the order modifying it. The word "appellant" will be used in this opinion to refer to the original defendant, Lily B. Howard, who died just prior to close of the trial, and for whom appellant executors were substituted as parties defendant.

Plaintiff was the niece of appellant, but their association for many years resembled that of mother and daughter. From the time of plaintiff's birth in 1896 to that of her

secret marriage in 1918, she lived with and was supported by appellant, and between them there was a great intimacy and affection. Subsequent to the marriage this affectionate relationship was broadened to embrace plaintiff's three children.

In June, 1927, plaintiff decided to obtain a divorce and informed appellant of this decision. Appellant was concerned lest there be publicity damaging to her social and business connections. Her conversation with plaintiff at this time, according to the latter's testimony was as follows: Plaintiff: "I had driven over to my aunt's home with my three children; and I walked into her bedroom; and my aunt said, 'My heavens, what has happened to your eyes?' I said, 'Homer has blackened both my eyes; he has beat me up all over my body and threatened to kill the children; I am afraid of him; I cannot live with him any longer; I am going right down now to see an attorney and get a divorce.' My aunt said, 'You can't do that here; think of my banks; think of the Baldwin name having any scandal here'; and I said, 'I have heard if I go to Reno, Nevada, to get a divorce, I can't get alimony.' My aunt said, 'Never mind about that; if you do that and go to Reno, Nevada, and get a divorce, I will support you the rest of your life; I will take care of the children and I will educate them.' . . . I said that for her sake that I would do what she asked me to do."

Plaintiff acted promptly upon appellant's proposal. With money supplied to her by appellant, she left for Reno about June 10, 1937, and there procured a divorce. She made no demand for alimony or for an allowance for support of the children. In the month of October she returned to Los Angeles, and reestablished her residence and that of the children in their family home. From that time until June, 1929, she received from $200 to $250 a month from appellant. Appellant then asked that the family move in with her, saying, so plaintiff testified, " . . . There is no need for us both keeping houses, and I have to take care of you anyway; you might as well come over here and bring the children and live with me and protect me from Will (appellant's husband), I am afraid of him." Plaintiff and the children thereupon moved to appellant's home, where appellant cared for them and, until some time in the year 1933, gave them about $150 a month. Thereafter they received no allowance, but they

continued to reside with appellant until July 6, 1936. On that date, following a quarrel between plaintiff and appellant's husband, they were barred from the house.

On December 23, 1936, plaintiff commenced the present action. She charged that the ouster constituted a breach of the contract whereby, in consideration of plaintiff giving up her possible right to alimony and support at the time she secured her divorce, appellant had agreed to support her for the rest of her life and to care for her children until they became self-supporting. Appellant answered the complaint with a general denial, and upon trial of the cause flatly stated that she had never entered into any such contract. This testimony and that of plaintiff to the contrary created a conflict of evidence on the issue of existence of the agreement, which conflict was resolved by the jury in plaintiff's favor. The sufficiency of the evidence to support its conclusion is not questioned.

The principal contention urged on this appeal is that the agreement was void as against public policy and therefore the trial court erred in permitting plaintiff to recover upon it. Bearing in mind the rule that a contract should, if possible, be construed to make it valid and enforceable, we cannot agree that illegality is established. While the law does not countenance any contract "having for its object the dissolution of the marriage contract, or facilitating that result" (*Pereira* v. *Pereira*, 156 Cal. 1, 5 [103 Pac. 488, 134 Am. St. Rep. 107, 23 L. R. A. (N. S.) 880]), the agreement here involved does not fall within the inhibited class. The evidence shows without dispute that it was not until after plaintiff had finally decided to divorce her husband, and had so informed appellant, that appellant proposed the manner in which she should proceed in order to avoid local publicity. Nor was the relinquishment of the possible right to alimony and support an inducement to the husband to permit plaintiff to prosecute her action without opposition. The husband testified that his marital relations with plaintiff were discordant, and admitted that on at least one occasion she had suffered physical abuse at his hands. Aside from any question of alimony, it appears that she had a good cause of action for divorce against which he could not have successfully defended. There is no intimation that the divorce was collusive. The husband was not a party to the agreement be-

tween plaintiff and appellant. There is no proof that he was aware of it. In short, the agreement does not fall within the category of a "collateral bargaining promotive of divorce", such as that condemned in *Newman* v. *Freitas*, 129 Cal. 283 [61 Pac. 907, 50 L. R. A. 548], and like cases. Its purpose was directed solely to a means of avoiding local publicity, and it was without effect in so far as the actual question of procuring of the divorce was concerned. In 5 Williston on Contracts, revised edition, page 4557, section 1629a, it is said: "Though the power of courts to invalidate bargains of parties on grounds of public policy is unquestioned and is obviously necessary, the impropriety of a transaction should be clear in order to justify the exercise of the power. . . No doubt, wherever it is possible, the courts will interpret the contract so as to uphold it."

It is argued that the consideration for the contract was illegal in that it required plaintiff to procure a divorce in Nevada on simulated residence there, which was not only an evasion of the divorce laws and a violation of the public policy of this state, but also the commission of a fraud upon the courts of Nevada. (*Delanoy* v. *Delanoy*, 216 Cal. 27, 39 [13 Pac. (2d) 719, 86 A. L. R. 1321]; *Kegley* v. *Kegley*, 16 Cal. App. (2d) 216 [60 Pac. (2d) 482]; *Ryder* v. *Ryder*, 2 Cal. App. (2d) 426 [37 Pac. (2d) 1069]; *Presson* v. *Presson*, 38 Nev. 203 [147 Pac. 1081].) A complete answer to this argument lies in the fact that nothing was said at the time the contract was made, nor was there any stipulation in it, or inference to be drawn from it, that plaintiff's residence in Nevada was not to be a *bona fide* and permanent one. No demand was made upon her to get the divorce upon a simulated residence, or to return to California after it was granted. Indeed, the evidence shows without contradiction that it was not until some two years after plaintiff's return to California that she was invited to move in with appellant.

Appellant's plea of the statute of frauds (Civ. Code, sec. 1624, subd. 1) is of no avail because she failed to properly urge it in the trial court. Although the general denial of her answer was sufficient to raise the issue (12 Cal. Jur., sec. 109, p. 940), she thereafter failed to pursue it. When the cause came on for trial, she permitted parol proof of the contract to be admitted without objection on her part. This was a waiver of her right to rely upon the statute. (*Nunez*

v. *Morgan,* 77 Cal. 427 [19 Pac. 753]; *Schultz* v. *Noble,* 77 Cal. 79 [19 Pac. 182]; *Livermore* v. *Stine,* 43 Cal. 274; *Christie* v. *Commercial Casualty Ins. Co.,* 6 Cal. App. (2d) 710, 720 [45 Pac. (2d) 263]; *Durbin* v. *Hillman,* 50 Cal. App. 377 [195 Pac. 274].)

Upon the announcement of appellant's death just prior to submission of the cause, the trial court correctly instructed the jury that the action was one which survived, and that the death did not in any way affect the issues which were to be decided. The rule, that an executory contract of a strictly personal nature is terminated by the death of the party by whom the personal service is to be performed, is not applicable where the service is of such a character that it may as well be performed by another, or where the contract, by its terms, shows that performance by others was contemplated. (*Janin* v. *Browne,* 59 Cal. 37; *Husheon* v. *Kelly,* 162 Cal. 656 [124 Pac. 231]; *Guardianship of Cornaz,* 8 Cal. (2d) 347 [65 Pac. (2d) 784]; 11B Cal. Jur., p. 194, sec. 796; 12 Am. Jur., p. 949, sec. 375.) Under the contract here involved no strictly personal service was required of appellant, nor was any intent manifested that performance should depend upon her continued existence.

Two years after the divorce, plaintiff and her children took up their residence with appellant at appellant's request. Appellant's promise to support plaintiff for life and to educate and care for the children until they became self-supporting did not involve the rendition of any personal service. The allowance of a fixed sum of money would have constituted a full and practical compliance with all that she agreed to do. (*Guardianship of Cornaz, supra,* at page 354.)

Misconduct on the part of plaintiff's counsel is assigned as ground for reversal of the judgment. The trial was punctuated by acrimonious discussion and offensive repartee, calling forth severe reprimands from the trial court. The record shows that the court was justified in including counsel for both sides in his censure. But it also shows that any danger of prejudice to the rights of either party was removed by due admonishment and instruction to the jury.

The jury, by special interrogatories, found that plaintiff suffered damage in the sum of $78,300, and that the children, age 19, 17 and 13 years, were damaged in the respective sums of $10,000, $15,000 and $17,500. The verdict of $120,-

800 represented the total of these sums. As a condition of denial of motion for new trial, the court reduced this figure approximately 29 per cent, or to the sum of $85,727. Appellant contends that even in the reduced figure the award is so grossly disproportionate to any compensation reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion, prejudice, speculation, or conjecture, rather than of an honest and sober judgment. (*Kirschbaum* v. *McCarthy*, 5 Cal. (2d) 191, 195 [54 Pac. (2d) 8].) The facts presented by the record on appeal, however, do not support this position. The reduced award, invested in an annuity, would provide an annual income over the period of plaintiff's life expectancy (26.72) years, of approximately $5,200. From an evaluation of the family's ordinary needs—not measured by extravagance or by their ability to spend, but by their standard of living according to their station in life (*Canfield* v. *Security-First Nat. Bank*, 13 Cal. (2d) 1 [87 Pac. (2d) 830])—it appears that the judgment is reasonable.

▪ Comprehensive instructions were given to the jury on the subject of the measure of damages and the elements which might properly enter into their computations, but they were not told specifically to consider the following factors: (1) Allowance for the present or commuted value of the future payments awarded on the basis of plaintiff's life expectancy; and (2) Credit for any amounts which plaintiff or the children might earn. Although appellant did not request any instructions on these subjects, she now contends that their omission rendered the charge fatally defective. That, however, is not the case. So far as earnings are concerned, there was no agreement that possible earnings of plaintiff were to be deducted from the allowance made for her support. The children were to be taken care of only until they became self-supporting. These terms were so clear as to require no explanation to the jury. As to allowance for the present value of future payments, it may be presumed, in the absence of a requested instruction on the subject, that this factor received due consideration in the jury's deliberations, or if it did not, that the omission was cured by the reduction of the verdict. ▪ Appellant, so far as the record shows, made no demand upon the trial court to explain the manner in which the reduction was computed; hence she cannot complain of

the absence of such a specification (*Draper* v. *Hellman Com. etc. Bank,* 203 Cal. 26, 41, 42 [263 Pac. 240]), but must submit the verdict for review as if it had in the first instance been returned by the jury in the reduced amount (*Sherwood* v. *Jackson,* 126 Cal. App. 441, 444 [14 Pac. (2d) 861]). In such amount, the award is not excessive as a matter of law.

The judgment is affirmed.

Rehearing denied. Houser, J., voted for a hearing.