Filed 3/30/22  Poodles, Inc. v. Kuhn CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| POODLES, INC., et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>ROGER C. KUHN et al.,<br><br>　　　Defendants and Respondents. | A161161<br><br>(San Francisco City & County<br>　Super. Ct. No. CGC-16-550634) |

　　　　　Plaintiffs Poodles, Inc. (Poodles), Patrick & Friends, Inc. (PFI) and Jill Williamson filed a complaint against defendants Roger C. Kuhn, James W. McIntyre, Joseph Lynch, Michael Ina, Eugene F. Lynch, Sherman Wong, Lawrence Bennett, All Animals Properties, LP (AAP), 1333 Ninth Avenue, LLC, and All Animals Emergency Hospital, Inc. (AAEH) (jointly, defendants) asserting defendants engaged in fraudulent conduct and breached various agreements associated with the purchase of defendants' animal hospital and specialty practice.  The trial was bifurcated, and the initial jury trial resulted in a verdict in plaintiffs' favor on almost all counts.  Following the subsequent bench trial, the court vacated a portion of the jury verdict on the basis that the statute of frauds defense applied to bar certain oral referral agreement claims.  The court also concluded in relevant part that there was no alter ego liability between defendants.

On appeal, plaintiffs contend the trial court erred by applying the statute of frauds, utilized an erroneous legal standard in evaluating alter ego liability, and improperly failed to reopen evidence on the issue of alter ego liability. Plaintiffs also contend the trial court erred in barring evidence and argument of delay damages in advance of the jury trial. We disagree and affirm the judgment.

## I.

## BACKGROUND

### A. *Factual Background*

In August 2012, Poodles leased from AAP two parcels of commercial property (property). The lease provided for an option to purchase the property " 'for the fair market value of the property at the time that Tenant exercises this option, and on such other mutually agreed terms.' " At the same time the lease was executed, PFI executed a "Purchase and Sale of Assets Agreement" with AAEH to purchase all tangible and intangible real and personal property of AAEH's emergency veterinarian business, including in part, "All of the goodwill and going concern value of AAEH," for $1.7 million (asset purchase agreement).[1] PFI made an initial payment of $170,000 and executed a promissory note in the principal amount of $1.53 million (note).

Williamson subsequently invested approximately $500,000 to improve the property, and informed AAP that Poodles wished to exercise its option to purchase the property.

After the parties were unsuccessful in negotiating the purchase option, Poodles filed a lawsuit against AAP and 1333 Ninth Avenue LLC, a general partner of AAP, to compel the sale of the property (*Poodles, Inc. v. All*

---

[1] Jill Williamson is the majority owner of both Poodles and PFI.

2

*Animals Properties, LP* (Super. Ct. S.F. City & County, 2016, No. CGC-15-545260) (*Poodles I*). Poodles alleged it repeatedly requested that AAP negotiate a mutually agreeable purchase and sale agreement, but AAP had refused to do so. The complaint sought specific performance and attorney fees.

Following a bench trial, the trial court entered judgment in favor of Poodles. The court ordered that Poodles "shall have until April 25, 2016" to exercise its right to purchase the property for $1.35 million. The court also ordered the outstanding balance on the note to be paid in full as part of the sale.

## B. Procedural Background

In February 2016, approximately three months before judgment in *Poodles I*, Poodles filed the present lawsuit against defendants (*Poodles II*). The complaint alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional misrepresentation. The complaint alleged defendants failed to maintain and repair the property during the term of the lease, refused to honor the option to purchase the property, and acted in bad faith to prevent the purchase of the property in order to collect a monthly rent higher than the market value. The complaint further asserted defendants intentionally misrepresented that they would sell the property, while knowing they did not intend to do so. The complaint sought compensatory and punitive damages.

Defendants subsequently filed a motion for judgment on the pleadings. They asserted that *Poodles I* and *Poodles II* shared the same primary right, i.e., that defendants breached Poodles's option to purchase the property. Defendants alleged Poodles should have sought damages for overpayment of rent in *Poodles I*, and its failure to do so barred it from seeking such damages

in *Poodles II*. Defendants thus requested the court enter judgment against the complaint in its entirety.

The trial court granted the motion without leave to amend, in part, and with leave to amend, in part. Specifically, the court granted the motion without leave to amend as to the breach of the implied covenant of good faith and fair dealing and the intentional misrepresentation claims because it concluded Poodles "improperly split its causes of action arising out of Defendant's [*sic*] failure to comply with [the] option provision of the lease." The court granted the motion with leave to amend as to the breach of contract claim arising from defendants' alleged failure to maintain the property.

Poodles filed an amended complaint, followed thereafter by a second amended complaint (SAC). The SAC added, in relevant part, PFI and Williamson as plaintiffs and AAEH as a defendant. The SAC alleged breach of the asset purchase agreement, breach of oral referral agreements, breach of the lease agreement, fraud and misrepresentation, breach of contract, and promissory estoppel. The claims were based on allegations that defendants improperly refused to sell the property to Poodles, refused to honor oral agreements to refer patients to plaintiffs, and improperly required plaintiffs to preemptively repay the note as a condition for exercising the option to purchase. The SAC also asserted defendants breached the lease agreement by failing to maintain and make necessary repairs to the property.

Defendants again filed a motion for judgment on the pleadings. They asserted all of the claims were either barred by res judicata because plaintiffs could have—but failed to—litigate the issue in *Poodles I*, or barred by the statute of frauds and/or the statute of limitations.

4

The trial court granted the motion with leave to amend as to the breach of oral referral agreements and promissory estoppel claims in order to allow plaintiffs to plead all material terms of the alleged oral agreements. The court also granted the motion without leave to amend as to the breach of contract claim because repayment of the note was adjudicated in *Poodles I*. Finally, the court denied the motion as to the breach of the asset purchase agreement, the breach of the lease agreement, and the fraud/misrepresentation claims.

Plaintiffs filed a third amended complaint, followed thereafter by a fourth amended complaint (FAC). The FAC contained the same claims against defendants as were in the SAC, apart from the fifth cause of action regarding the note. Defendants filed an answer, which asserted various affirmative defenses including that the referral agreements were barred by the statute of frauds.

### 1. *Phase One—The Jury Trial*

Prior to trial, defendants filed two motions in limine to exclude evidence and argument regarding damages caused by the delay in selling the property to Poodles. First, defendants sought to exclude plaintiffs' expert from offering an opinion regarding such damages on the basis that such testimony would be speculative. Second, defendants asserted any evidence or argument regarding delay damages is barred by claim preclusion. The court granted these motions.

Additionally, defendants filed a motion to "establish the order of proof at trial." Defendants asked the court to first conduct a bench trial on various issues and equitable affirmative defenses, such as standing, alter ego liability, estoppel, res judicata/claim preclusion, the statute of limitations, and waiver. Defendants then proposed a second phase in which a jury would

decide any remaining issues apart from punitive and exemplary damages, which the court would decide in a third phase. The court declined to adopt this approach, and proceeded with a jury trial followed by a bench trial on various remaining issues.

The court conducted a jury trial on the breach of asset purchase agreement, breach of oral referral agreements, breach of lease, and false promise causes of action. Following that trial, the jury returned a verdict in plaintiffs' favor as to all causes of action except false promise, and awarded various damages.

### 2. *Phase Two—The Bench Trial*

Prior to the bench trial, the parties submitted various briefs regarding alter ego liability and promissory estoppel. As part of the briefing on promissory estoppel, defendants argued the oral referral agreements were invalid under the statute of frauds.

Following the bench trial, plaintiffs submitted an opposition brief to defendants' statute of frauds defense. Plaintiffs argued the issue should have been raised prior to the jury trial as a motion in limine, or as a motion for directed verdict or nonsuit. Plaintiffs also raised various arguments for why the court should find the statute of frauds inapplicable. Plaintiffs again challenged the merits of the statute of frauds defense in their closing brief, but did not reassert that defendants had waived the defense by failing to raise it during the jury trial.

The trial court subsequently issued a tentative decision and proposed statement of decision as to the following issues: (1) was AAP an alter ego of AAEH; (2) were AAEH steering committee members or shareholders alter egos of AAEH; (3) was the breach of oral referral agreements claim barred by the statute of frauds; (4) should judgment issue for plaintiffs on the

6

promissory estoppel claim; and (5) were defendants entitled to any setoff for the settlement paid to plaintiffs by their former counsel. The court rejected plaintiffs' argument that AAP, AAEH steering committee members, or AAEH shareholders were alter egos of AAEH. The court further concluded there was no writing to support the oral referral agreements and the evidence supports an interpretation that the agreements could not be performed within a year. Accordingly, the court concluded the statute of frauds barred the breach of oral referral agreements cause of action. Next, the court considered the promissory estoppel claim. The trial court found the evidence regarding the agreements too indefinite and denied the claim. Finally, the court denied defendants' request for a setoff for damages paid by plaintiffs' former counsel.

After considering plaintiffs' various objections to the proposed statement of decision, the trial court adopted its proposed statement of decision and entered judgment in accordance with its order. Plaintiffs timely appealed from the judgment.

## II.
## DISCUSSION

Plaintiffs assert the trial court erred by (1) applying the statute of frauds to bar the oral referral agreements; (2) employing the wrong legal standard to evaluate alter ego liability; (3) abusing its discretion by refusing to reopen evidence of alter ego liability; and (4) barring fraud claims and underlying evidence on res judicata grounds. We address each argument in turn.

### A.  *Statute of Frauds*

Plaintiffs raise two arguments with respect to the statute of frauds. First, they contend defendants waived the defense by failing to assert it at

7

the jury trial.  Second, plaintiffs argue defendants failed to establish that the statute of frauds applies because the agreement could have been performed within one year.  We disagree for the reasons set forth below.

### 1. Waiver

Plaintiffs contend defendants waived the statute of frauds defense by failing to raise it before or during the jury trial.  "The statute of frauds is treated as a rule of evidence which, if not properly raised, may be forfeited.  [Citations.]  The California Supreme Court explained, 'it is settled that . . . a defendant waives his right to rely upon any provisions of the statute of frauds [citation] by failing to (a) demur to the complaint, (b) object to the introduction of testimony to prove the oral agreement at the time of trial, or (c) make a motion to strike such testimony.'  [Citation.]  A general denial in an answer is sufficient to preserve a statute of frauds objection [citation], as is a general demurrer."  (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 551–552, citing *Pao Ch'en Lee v. Gregoriou* (1958) 50 Cal.2d 502, 506 and *Howard v. Adams* (1940) 16 Cal.2d 253, 257.)

Here, defendants asserted the statute of frauds in a motion for judgment on the pleadings in connection with the SAC and their demurrer to the third amended complaint.  In response, plaintiffs included approximately two and a half pages of argument in the FAC regarding why the statute of frauds did not apply.  Defendants did not again demurrer but asserted the statute of frauds as an affirmative defense in their answer to the FAC.

Prior to the start of the jury trial, defendants submitted a proposal for establishing proof regarding various legal and equitable issues, although the statute of frauds was not specifically listed.  Defendants then filed a pretrial brief in which they contested the validity of the oral referral agreements,

8

although again without specifically addressing the statute of frauds, and again requested that "[s]everal issues, such as the resolution of equitable issues and affirmative defenses such as claim preclusion" be resolved by the court prior to the jury trial. The court rejected defendants' proposal and concluded, "I do think we can proceed efficiently by having most of the testimony necessary for the affirmative defenses and the alter ego issues heard by the jury with any additional issues heard by the Court on a day that we don't have the jury here."

During phase one of trial—the jury trial—plaintiffs presented testimony regarding the oral referral agreements. Defendants did not object to such evidence but their witnesses testified that no such agreements existed, and defendants later relied on plaintiffs' testimony when arguing the applicability of the statute of frauds.

Following the jury trial, defendants and the court identified the statute of frauds defense as an issue to be tried in phase two of trial—the bench trial. Plaintiffs' counsel objected, stating it should have been raised prior to the matter being submitted to the jury because "[i]f there was a legal defense to [the second cause of action for breach of the oral agreements], it shouldn't have gone to the jury."

Both defense counsel and the court noted the ongoing ambiguity and confusion regarding the scope and terms of the oral referral agreements prior to the jury trial. The court stated, "[I]t seems to me it was always anticipated by the plaintiffs that there might be a statute of frauds defense. [¶] My understanding, although we never discussed it, is that we wouldn't address this issue until we found out whether the jury, as a matter of fact, found that there was an oral contract. . . . [¶] . . . [¶] . . . So I never expected I would be addressing this issue until after the verdict came in since I think it was a

9

hotly contested issue as to whether or not, first, there was [an] oral contract between the plaintiffs and any of the defendants and, if so, what it was, what it's [*sic*] terms and conditions were." The court then concluded, because the jury found such contracts to exist, it would now "make a determination as to whether or not the statute of frauds applies or whether there's an exception to it."

Plaintiffs rely primarily on *Bank of America National Trust & Savings Association v. Hutchinson* (1963) 212 Cal.App.2d 142 to contend these steps were insufficient to preserve the objection, and it was required to be raised at trial. We find *Bank of America* distinguishable. In that matter, a bank employee made certain representations that induced certain bank customers to borrow money and lend it to another bank customer. (*Id.* at pp. 144–145.) On appeal, the bank argued testimony regarding its employee's representations should have been barred under section 1974 of the Code of Civil Procedure, "which provide[d]: 'No evidence is admissible to charge a person upon a representation as to the credit of a third person, unless such representation, or some memorandum thereof, be in writing, and either subscribed by or in the handwriting of the party to be charged.'" (*Bank of America*, at pp. 148–149.) The court noted the appellants failed to challenge such evidence until two weeks after trial concluded. (*Id.* at p. 149.) The appellate court thus concluded, "appellants are now foreclosed by the fatal fact that they tried their entire case without making any objection whatsoever to the reception of such evidence, although it was apparent throughout the trial, and prior thereto, (as witnessed by the joint pretrial statement) that respondents were relying upon said oral representations." (*Ibid.*) Likewise, *Howard v. Adams*, *supra*, 16 Cal.2d 253 and *Pao Ch'en Lee v. Gregoriou*, *supra*, 50 Cal.2d 502 are equally inapplicable. Those cases

10

involved situations in which the defendants asserted either a general denial or an affirmative defense in their answer but did not pursue the defense further or raise any objection to testimony about the oral agreements at trial. (*Howard*, at p. 257; *Pao Ch'en Lee*, at pp. 505–506.)

Here, defendants raised the issue in response to the operative pleadings and again before the bench trial. We are unaware of any authority suggesting defendants' repeat assertions of the statute of frauds—including during trial, albeit the second phase of trial—are insufficient to preserve the issue. Moreover, while the parties' discussion of the bifurcated trial did not expressly discuss the statute of frauds prior to the jury trial, the trial court explained in its statement of decision that it consistently understood that the statute of frauds would be part of the second phase of trial and be decided by the court rather than submitted to the jury. And the court further noted that the parties expressly identified the statute of frauds as an issue prior to the bench trial. Based on the foregoing, we cannot conclude the trial court abused its discretion in finding defendants did not waive the defense. (See *Rubinstein v. Fakheri* (2020) 49 Cal.App.5th 797, 805 ["We review for abuse of discretion the trial court's ruling that [defendant] did not timely raise the defense."].)[2]

### 2. *Applicability of Statute of Frauds*

Civil Code section 1624, subdivision (a)(1) invalidates an oral contract "that by its terms is not to be performed within a year from the making

___

[2] Plaintiffs also argue the trial court erred by improperly shifting the burden onto them to proactively challenge the statute of frauds defense. However, the issue was whether the statute of frauds defense was required to be raised during the first phase of trial—the jury trial—rather than during the second phase. Accordingly, the trial court evaluated whether plaintiffs waived or were equitably estopped from demanding a jury trial on the statute of frauds.

thereof." This portion of the statute of frauds applies only to those contracts that, by their terms, cannot possibly be performed within one year. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 671 (*Foley*).) Thus, if a condition terminating an oral contract may occur within one year of its making, then the contract is performable within a year and does not fall within the statute of frauds. (*Id.* at p. 673.) In other words, a contract, otherwise within Civil Code section 1624, subdivision (a)(1), may be taken out of its operation by the fact that a party may rightfully terminate the contract within a year. (*Plumlee v. Poag* (1984) 150 Cal.App.3d 541, 550.) This is true even though performance of the contract may extend for longer than one year if the contingency by which performance may be terminated does not occur. (*Foley*, at p. 673.)

In *Foley*, the Court of Appeal had affirmed a demurrer on the basis that inclusion of a term in an oral contract allowing termination only for cause created " 'a reasonable expectation of employment for more than one year (in which case the statute of frauds does apply, barring this action).' " (*Foley*, *supra*, 47 Cal.3d at p. 672.) The Supreme Court reversed, holding, "Even if the original oral agreement had expressly promised plaintiff 'permanent' employment terminable only on the condition of his subsequent poor performance or other good cause, such an agreement, if for no specified term, *could* possibly be completed within one year. [Citation.] Because the employee can quit or the employer can discharge for cause, even an agreement that strictly defines appropriate grounds for discharge can be completely performed within one year—or within one day for that matter." (*Id.* at pp. 672–673.) The court affirmed "the general rule that if a condition terminating a contract may occur within one year of its making, then the contract is performable within a year and does not fall within the scope of the

12

statute of frauds.  This is true even though performance of the contract may extend *for longer than one year* if the condition does not occur." (*Id.* at p. 673, italics added.)  Courts have subsequently applied *Foley* to contracts with definite terms.  (See, e.g., *Abeyta v. Superior Court* (1993) 17 Cal.App.4th 1037, 1044–1045.)

We must look to the terms of the oral referral agreements to determine whether the statute of fraud applies.  (See *Lacy v. Bennett* (1962) 207 Cal.App.2d 796, 800 (*Lacy*) ["The test for determining whether an oral contract is not to be performed within a year lies wholly within *its terms*."].)  At issue is the duration of the referral agreements and whether those agreements obligated defendants to make such referrals for longer than a one-year period.

Plaintiffs argue the referral agreements could, in fact, have been performed within a year.  They assert Williamson's testimony that she "anticipated the referrals continuing through the life of the [note], and beyond that 'as long as we did a good job,' " does not preclude the possibility of the note being repaid within a year.  Rather, plaintiffs contend such testimony merely suggests it was "unlikely" for the note to have been repaid within a year, which is insufficient to subject the agreements to the statute of frauds.

We agree a low probability of performance within a year does not, by itself, make an agreement fall within the scope of the statute of frauds.  (See *Lacy*, *supra*, 207 Cal.App.2d at pp. 800–801 ["The fact that performance within one year is not probable under the terms of the agreement does not bring it within the statute of frauds."].)  However, the record does not reflect a possibility of repayment within a year.

Williamson testified the referral agreement was for the duration of the note, stating, "[T]here was no expectation to me that they would go . . . beyond paying off the note." However, the record does not demonstrate that plaintiffs could have repaid the note within a year. While plaintiffs offered to repay the note as part of their attempts to exercise the purchase option in the lease agreement, the record is devoid of evidence demonstrating they had the funds to do so. To the contrary, as of July 2013, Williamson testified that she was "working hard" to get a loan to pay off the note—indicating plaintiffs neither had the assets to repay the note nor had yet secured funding to do so.

Plaintiffs argue the referral agreements were not tied to repayment of the note, but rather based on plaintiffs' performance.[3] This position contradicts Williamson's testimony. She repeatedly testified she "hoped" the referrals "would be indefinite, but I didn't—there was no expectation to me that they would go, more than likely, beyond paying off the note. [¶] At that point, I'd hoped I'd gained their referral business because I was doing a good job." Nothing in this testimony indicates the oral agreements contained a contract term that the referrals would continue as long as Williamson did "a good job."

Accordingly, the record demonstrates the terms of the oral referral agreements were not purely performance based, as in *Foley*, *supra*, 47 Cal.3d 654, and could not have been performed within a year. The trial court thus did not err in applying the statute of frauds.[4]

---

[3] Plaintiffs fail to cite any evidence demonstrating a negotiated term of the referral agreement was that it would continue as long as they provided adequate services.

[4] The trial court noted plaintiffs' introduction of damages through July 2019—despite the note being paid in full by April 2016—and the scope of the verdict's award of damages indicates a "finding by the jury that the oral agreements which they found to have been breached by the individual

## B. Alter Ego Liability

Appellants contend the trial court erred in concluding there was no alter ego liability. They assert the court ignored relevant evidence and improperly considered wrongful intent. We disagree.

### 1. General Legal Principles

"Whether a party is liable under an alter ego theory is normally a question of fact. [Citations.] 'The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court.' [Citation.] Nevertheless, it is generally stated that in order to prevail on an alter ego theory, the plaintiff must show that '(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected.' [Citation.]

" 'The alter ego test encompasses a host of factors: ". . . [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses[;] . . . the treatment by an individual of the assets of the corporation as his own[;] . . . the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities[;] . . . the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization[;] . . . the use of a corporation as a

---

defendants extended beyond the term of the [note] . . . ." We need not opine on this analysis. At most it suggests the jury concluded the duration of the referral agreements exceeded the duration of the note.

mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation[;] . . . . [¶] This long list of factors is not exhaustive. The enumerated factors may be considered "[a]mong" others "under the particular circumstances of each case." ' [Citations.] 'No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine.' " (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811–812.)

### 2. *Analysis*

The trial court concluded plaintiffs failed on both prongs of the analysis—namely, that (1) the individual defendants and AAP were not alter egos of AAEH, and (2) respecting the corporate formalities would not cause inequitable results.

### a. **Evidence of Unity of Interest**

In February 2017, AAEH made a distribution of the majority of its assets—approximately $1.5 million—to its shareholders. Plaintiffs assert that distribution happened after their counsel alerted AAEH that it would be added as a defendant in the SAC. Plaintiffs argue the trial court erred by failing to consider this distribution of assets from AAEH to its shareholders in determining whether alter ego liability should apply as to the individual defendants. They argue if the court had considered such evidence, it would have reached a different conclusion on alter ego liability. The record suggests otherwise.

Plaintiffs focus on the trial court's statement that it "give[s] no weight" to the evidence of the distribution to suggest the trial court ignored such evidence. To the contrary, the statement of decision discussed the distribution at length. The trial court began by discussing testimony by plaintiffs' counsel that he had multiple telephone conversations with AAEH's

16

counsel in which he requested mediation pursuant to the asset purchase agreement and advised AAEH's counsel that AAEH would be sued in the SAC.

The trial court also discussed defendants' evidence regarding the distribution. Specifically, it noted evidence that the distribution was preceded by a notice of election to dissolve the corporation. It also discussed testimony by Michael Ina and Phil Freund[5] that they were unaware that claims would be asserted against AAEH at the time of the distribution.

In considering this evidence, the trial court did not find plaintiffs' counsel's testimony persuasive. The trial court explained the asset purchase agreement contained a fee-shifting provision that required a demand for mediation which, if refused by the losing party, would give rise to an attorney fee claim. As a result, the trial court expected a contemporaneous e-mail or other documentation to memorialize the mediation demand and preserve the attorney fee claim. The court noted no such correspondence was produced. Instead, the record only contained an April 2017 e-mail addressing the mediation and stating, " 'I hereby give you notice,' " which the court found inconsistent with plaintiffs' position that notice had been given in January. The trial court thus concluded plaintiffs' evidence was insufficient to support their burden of proof, and found it of "no weight . . . for purposes of the alter ego analysis."

" 'Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when

---

[5] Dr. Ina was a veterinarian who participated in the negotiations over the sale of the pet hospital as part of AAEH's management team, and was involved in the decision to distribute assets. Mr. Freund served as the bookkeeper and accountant for AAP and AAEH, and made the distribution payments at issue.

supported by substantial evidence.' " (*Toho–Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108.)  Here, the trial court provided a detailed discussion of the evidence surrounding the distribution. This analysis identified evidence in favor of a unity of interest finding, such as (1) the common ownership between AAEH and AAP; (2) the overlap in address, accountant, and attorneys; and (3) AAP's flexibility with AAEH's rent payments, as well as evidence against a finding of unity of interest, such as (1) AAEH was a valid business which, for decades, operated an animal emergency hospital; (2) AAEH was properly capitalized while operating; (3) AAEH observed the required corporate formalities; and (4) AAP and AAEH "functioned as two related, but distinct, entities operating separate businesses."  It also considered evidence regarding the distribution and ultimately concluded such evidence did not impact its analysis as to whether there existed a unity of interests.  Accordingly, substantial evidence supports the trial court's conclusion that there was no unity of interest between AAEH and the individual defendants or AAP.

### b.  Wrongful Intent

Plaintiffs next challenge the second prong of alter ego liability, asserting an inequitable result does not require evidence of a wrongful intent. They contend the trial court erred by focusing on wrongful intent.  In response, defendants argue the trial court properly considered wrongful intent, in large part because plaintiffs argued the issue before the trial court.

As an initial matter and as set forth above, substantial evidence supports the trial court's holding that there was no unity of interest. Accordingly, based on that prong alone, plaintiffs cannot prove alter ego liability.  In any event, we conclude while wrongful intent is not necessarily a

required element of the inequitable results prong for alter ego liability, a mere inability to collect a debt is insufficient.

Historically, the California Supreme Court has set forth various articulations of the requirements for alter ego liability, including (1) looking to evidence of "bad faith" (see, e.g., *Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service, Inc.* (1932) 217 Cal. 124, 129 ["Bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence."]); (2) not expressly requiring a showing of bad faith but rather focusing on the issue of an inequitable or unjust result (see, e.g., *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [" 'if the acts are treated as those of the corporation alone, an inequitable result will follow' "]); (3) expressly providing that proof of actual fraud is not required (see, e.g., *Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514, 523 ["It is not necessary that the plaintiff prove actual fraud.  It is enough if the recognition of the two entities as separate would result in an injustice."]); and (4) disclaiming any requirement of wrongful intent (see, e.g., *Higgins v. Cal. Petroleum etc. Co.* (1898) 122 Cal. 373, 376 [finding constructive fraud even though the "parties may have supposed, and no doubt did suppose, that the transaction was a legal and valid one, but in so acting they acted at their peril"]).

More recent cases from various Courts of Appeal also have expressly held that " '[a]pplication of the alter ego doctrine does not depend upon pleading or proof of fraud.' [Citations.]  The doctrine can be invoked when adherence to the fiction of the separate existence of the corporation would promote injustice [citation] or bring about inequitable results."  (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1074, italics omitted (*Misik*).)

19

The Second Appellate District also directly addressed this issue in *Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811 (*Relentless*).  In that case, a judgment creditor moved to add the debtor partnership's limited partners and prior and current general partner corporations as judgment debtors.  The trial court found the individuals and corporations were the debtor's alter egos, but still denied the motion, finding the creditor failed to show an inequitable result.  (*Id.* at p. 813.)  The Court of Appeal reversed and held the trial court erred in requiring the creditor to prove the individuals acted with wrongful intent.  "The law does not require such proof.  Relentless was required to prove that the [individuals'] acts caused an ' " 'inequitable *result*.' " ' [Citation.]  Here the [individuals'] intent is beside the point. [¶] . . . Given the trial court's finding that the [entities and individuals] are one and the same, it would be inequitable as a matter of law to preclude Relentless from collecting its judgment by treating Airborne as a separate entity." (*Id.* at p. 816.)

Defendants challenge the reasoning in *Relentless*.  But we believe *Misik* and *Relentless* are consistent with the articulated public policy behind the statutory privilege of the corporate form:  " 'As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted.  When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' " (*Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at p. 300.)  " 'Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges.' " (*Shapoff v. Scull* (1990) 222 Cal.App.3d 1457, 1470, disapproved

20

on another ground by *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 521, fn. 10.)

While an unjust or inequitable result may be found regardless of wrongful intent, courts have repeatedly held "it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced . . . . In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor." (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 842; see also *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.) Allowing parties to pierce a corporate veil merely due to an unsatisfied debt would undermine the legitimate public policy of limited liability for corporations in the ordinary case. (See *Sonora Diamond Corp.*, at p. 539; *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 418.)

The holding in *Relentless* turned on the fact that there was a unity of interest between the defendant corporation and the judgment debtors. (*Relentless, supra*, 222 Cal.App.4th at p. 815.) Here, however, no such unity of interest was found. (See part II.B.2.a., *ante*.) All plaintiffs have demonstrated is their difficulty in enforcing a judgment against AAEH. That alone is insufficient.[6]

### 3. *Request to Reopen Evidence*

Finally, plaintiffs contend the trial court abused its discretion in refusing to reopen the trial to allow additional evidence that AAEH was on notice—as of the date of distribution—that it would be sued for breach of the asset purchase agreement.

---

[6] We further note the trial court also found no inequitable result because plaintiffs received payment for certain damages from their former counsel's insurance carrier.

"Trial courts have broad discretion in deciding whether to reopen the evidence." (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208.) A motion to reopen evidence may be granted only if the moving party makes a showing of good cause. (*Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776, 793.) It is proper to deny a motion to reopen evidence if the failure to introduce evidence earlier is a product of trial tactics. (*Rosenfeld, Meyer & Susman v. Cohen* (1987) 191 Cal.App.3d 1035, 1052–1053.) Moreover, "denial of a motion to reopen will be upheld if the moving party fails to show diligence or that he [or she] had been misled by the other party." (*Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 428.) We review a trial court's denial of a motion to reopen evidence for an abuse of discretion. (*Horning*, at p. 208.)

Here, plaintiffs sought to introduce an e-mail from their counsel to Williamson regarding a conversation he had with AAEH's counsel, along with their counsel's telephone records. Plaintiffs contend this evidence would demonstrate AAEH was on notice of the pending legal claims prior to its distribution of assets. However, plaintiffs fail to explain why this evidence was not originally presented at trial. The timing of the distribution and notice of the pending legal claim was indisputably at issue, as evidenced by the competing testimony on the issue. Likewise, the evidence plaintiffs sought to introduce—an e-mail between their counsel and Williamson and their counsel's telephone records—were materials in their (or their counsel's) possession. Accordingly, the record suggests plaintiffs' failure to originally introduce the evidence at trial was an intentional trial tactic or due to a lack

22

of diligence. Regardless, the trial court did not abuse its discretion in denying plaintiffs' motion to reopen evidence.[7]

## C. Delay Damages

As discussed above, the trial court excluded evidence and argument of damages resulting from the delayed exercise of the option to purchase on the grounds that (1) it was barred by res judicata, and (2) expert testimony on the issue was speculative. Plaintiffs contend the trial court erred in so holding.

### 1. Res Judicata

Plaintiffs contend the trial court erred in holding the delayed damages evidence was barred by res judicata.[8] Specifically, plaintiffs argue the trial court misinterpreted prior rulings and erroneously concluded claims arising from the asset purchase agreement were analogous to the breach of lease claims that were previously barred by res judicata.

#### a. Relevant Background

In ruling on defendants' judgment on the pleadings in connection with the SAC, the trial court granted the motion as to the fifth cause of action (related to the note), granted it with leave to amend as to those causes of action arising from the oral referral agreement, and denied the motion as to the first, third, and fourth causes of action, which related in relevant part to breach of the asset purchase agreement.

---

[7] Because we conclude the trial court did not err, we need not address plaintiffs' arguments that any alleged error was prejudicial.

[8] Plaintiffs' opening brief also argues the trial court erred in holding the intentional misrepresentation claim was barred by res judicata. Defendants asserted plaintiffs forfeited this argument by failing to raise it in the lower court, and plaintiffs concede the issue in their reply brief. Accordingly, we do not address the issue.

At the hearing on the motion, the parties and the court extensively discussed whether the claims arose from the option agreement, which had been litigated in *Poodles I*. The court stated, "[M]y understanding is this case is not dealing with the breach of the lease and the option to purchase which was already resolved. . . . Counsel has already said that and that is part of the ruling." The court further stated, "And then on the purchase agreement in that instance there, who knows. I mean, they're talking about the value there, is what I hear you telling me." The court noted defendants' motion was "really just a demurrer," and these issues may be more appropriate to be raised "in an MSJ, MSA at this particular point." The court thus denied the motion as to the first, third, and fourth causes of action because "[a]t least partially the[y] do not arise out of issues that were or should have been previously litigated."

Prior to trial, defendants filed two motions to exclude evidence and argument of damages caused by the delay in executing the option to purchase the property. The court granted these motions. The court explained it was bound by its prior rulings on defendants' motions for judgment on the pleadings as to the complaint and the SAC. Specifically, it found those orders struck claims arising from the primary rights litigated in *Poodles I*—i.e., "(1) The right to compliance with the lease with respect to the exercise of the right to exercise the option to purchase the property; [¶] (2) The right to compliance with the covenant of good faith and fair dealing with respect to invoking the option to purchase under the lease; and [¶] (3) The right to be free of intentional misrepresentations with respect to the option to purchase under the lease." The court also commented the 2017 order "necessarily rejected" a distinction between the lease and asset purchase agreement when it struck without leave to amend the claim for breach of the asset purchase

24

agreement. However, the court emphasized it would allow evidence of delay damages provided such damages did not arise from the primary rights barred by *Poodles I.* For example, the court explained it would allow evidence of damages to the value of the business and lost revenue from retaliation and the discouragement of referrals.

### b. Analysis

Plaintiffs first assert the court erred by effectively overruling the prior orders, which allowed the causes of action arising from the asset purchase agreement to proceed. We disagree.

In ruling on the motion for judgment on the pleadings, the court expressly noted the breach of the option to purchase was resolved in *Poodles I.* However, it also acknowledged that separate rights and resulting harms may have been caused under the asset purchase agreement—such as damage to "the value" of the assets purchased.[9] The subsequent order on the in limine motion to exclude delay damages reflected this distinction between claims related to the lease and option to purchase versus claims related to the asset purchase agreement. The trial court acknowledged defendants' unwillingness to facilitate the option to purchase the property may have decreased the value of the business purchased. It thus explained, "There is evidence that some of the departing veterinarians also left due to the delay in purchasing the property and the consequent inability to improve the facilities." And the court did not bar such damages. The court specifically rejected defendants' arguments to preclude such damages because "that result is neither required by the 2016 order and the 2017 order nor

---

[9] And, in fact, the first and fourth causes of action in the SAC expressly identified damages to the value and purchase price of the pet hospital and specialty practice that were the subject of the asset purchase agreement.

25

appropriate, and the evidence will be admitted." However, the court did bar evidence of delayed damages arising solely from the delay in exercising the option agreement because the option provision in the lease agreement had been resolved in *Poodles I.*

Next, plaintiffs argue the court erred by framing the primary right too generally as the right to exercise the option to purchase the property. We do not disagree with plaintiffs that the same conduct could result in separate primary rights related to breaches of the lease agreement—barred under *Poodles I*—and the asset purchase agreement. However, plaintiffs fail to provide any analysis of which damages flowed from which breaches. The trial court concluded the damages caused by a delay in purchasing the property were related to the breach of the option agreement in the lease, not the asset purchase agreement. Conversely, the trial court noted evidence related to decreased value of the assets purchased as a result of the delayed purchase would be appropriate. Defendants fail to provide meaningful analysis of how the delay damages at issue relate to the breach of the asset purchase agreement.

Finally, plaintiffs argue res judicata only applies for the "same cause of action 'between the same parties or parties in privity with them.'" But plaintiffs' opening brief does not argue the trial court erred in finding that the claims arising from *Poodles I* were barred by res judicata. Rather, they only challenge the in limine orders excluding evidence of certain damages because they assert those damages relate to the breach of the asset purchase agreement claims, not the claims in *Poodles I.* Accordingly, the trial court's order finding the claims in *Poodles I* were barred by res judiciata is not before

26

this court.[10]  (See *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 109 [argument on appeal waived by failure to present facts supported by the record and legal argument supported by authority].)

## 2. *Expert Testimony*

Plaintiffs also challenge the trial court's ruling excluding expert testimony on the issue of delay damages.  As discussed in part II.C.1., *ante*, the trial court did not err in excluding evidence or argument regarding delay damages to the extent they arose from the primary rights barred by *Poodles I.*  The proffered testimony by plaintiffs' expert appears to fall within that category of delay damages—damages caused by a delay in executing plans for an expansion.

Regardless, we do not conclude the trial court erred in finding the proposed testimony too speculative.  The California Supreme Court set forth the standard for lost business profits in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*).  "Regarding lost

---

[10] Plaintiffs also argue without analysis that the ruling on alter ego liability "would have foreclosed any finding of privity."  But plaintiffs fail to recognize that the alter ego doctrine rests on considerations distinct from the concept of privity.  (Compare 9 Witkin, Summary of Cal. Law (11th ed. 2017) Corporations, § 11, p. 811 ["Where a corporation is used by an individual or individuals, or by another corporation, to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may *disregard the corporate entity* and treat the acts as if they were done by the individuals or by the controlling corporation."] with *Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1069–1070 ["The concept of privity for the purposes of res judicata or collateral estoppel refers 'to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' "].)

business profits, the cases have generally distinguished between established and unestablished businesses." (*Id*. at p. 774; see *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 762–763 (*Greenwich*) [lost profits are frequently deemed uncertain and speculative where the business that claims them was a new venture].) " 'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions.' " (*Sargon*, at p. 774.)

" 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' " (*Sargon*, *supra*, 55 Cal.4th at p. 774; see *Greenwich*, *supra*, 190 Cal.App.4th at p. 766 [rejecting real property developer's lost profits as uncertain and speculative].)

In evaluating the trial court's order excluding plaintiffs' expert, we utilize the abuse of discretion standard. (*Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc*. (2000) 85 Cal.App.4th 1042, 1051.) The trial court has " 'wide latitude . . . in determining whether the

28

matters relied upon by [the] expert[ ] in forming opinions are too speculative.' " (*Thai v. Stang* (1989) 214 Cal.App.3d 1264, 1276.)

Here, the court disregarded the evidence submitted by plaintiffs— namely, a document from Williamson's architect providing several options for expanding and a letter of interest from the Bank of San Francisco. While some courts may have considered such evidence, we cannot conclude the trial court's refusal to do so constituted an abuse of discretion. For example, because no plans were drawn or finalized, the scope and cost of any expansion was unknown. Without specific plans, the cost of any expansion, the potential scope of additional services, and any resulting profits would arguably be speculative.

In *Greenwich*, our colleagues in Division Two addressed in relevant part "whether lost profits may be awarded . . . for breach of a real property sale agreement where the buyer intended to renovate and sell the property at a profit." (*Greenwich*, *supra*, 190 Cal.App.4th at p. 743.) In rejecting the claim for lost profits, the court concluded, "The existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits." (*Id.* at p. 763.) The court further explained, "The lost profits claim was based on the assumption that Greenwich S.F. would have constructed the residence according to the plans and specifications without changes and that the venture would have been profitable. These assumptions were inherently uncertain, contingent, unforeseeable and speculative. The proposed real estate development project here involved numerous variables that made any calculation of lost profits inherently uncertain." (*Id.* at p. 766; see also *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975, 978 [lost

29

profits are "frequently denied as too speculative" in circumstances where a contractor seeks lost profits it might have earned on unawarded contracts].)

We find the reasoning in *Greenwich* applicable here. As noted by our colleagues, the mere existence of plans does not suggest those plans will be built or reasonably result in profits. And here, plaintiffs did not even present finalized plans, but rather various options for the expansion. While plaintiffs may have presented more evidence regarding potential plans if given the opportunity, their lack of definitive plans makes the proposed expansion "inherently uncertain, contingent, unforeseeable and speculative." (See *Greenwich*, *supra*, 190 Cal.App.4th at p. 766.) Accordingly, we cannot conclude the trial court abused its discretion in excluding plaintiffs' expert from testifying about delay damages.

## III.

## DISPOSITION

The judgment is affirmed. Defendants may recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

MARGULIES, ACTING P. J.

WE CONCUR:


BANKE, J.


EAST, J.*


A161161
*Poodles, Inc. v. Kuhn*

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31